**Mrs. Daisy Miller Boyd BEL and Richard E. Gerard, Co-executors under the Last Will and Testament of John Albert Bel, Deceased, et al., Plaintiffs-Appellants-Cross-Appellees,**

v.

**The UNITED STATES of America, Defendants-Appellees-Cross-Appellants.**

**No. 71-1232.**

United States Court of Appeals, Fifth Circuit.

Dec. 9, 1971.

Charles G. Barnett, Tax Division, Dept. of Justice, Fort Worth, Tex., Fred B. Ugast, Asst. Atty. Gen., Meyer Rothwacks, Atty., Tax Division, Dept. of Justice, Washington, D. C., Donald L. Walter, U. S. Atty., Shreveport, La., Michael L. Paup, Atty., Dept. of Justice, Tax Division, Washington, D. C., for appellees.

Before GEWIN, GOLDBERG, and DYER, Circuit Judges.

GOLDBERG, Circuit Judge:

In this estate tax case we are confronted with three issues, one of which concerns the quantum of inclusion in the decedent's taxable estate of an accidental death policy inceptively procured within three years of the decedent's death. We deem this issue to be of transcendent importance. While the other two problems, which involve the interrelationship of the estate tax marital deduction with Louisiana's forced heirship laws and estate tax apportionment statute, do have substantial impact upon the taxpayers, they are of lesser jurisprudential significance. We first turn to the Goliath of the triad.

### I. *Accidental Death Policy*

Commencing in October of 1957, the decedent, John Albert Bel, purchased annually an accidental death policy on his own life in the principal amount of $250,-000. Each policy covered a term of one year, and the last such policy was acquired in October of 1960, less than one year prior to the decedent's death. While the decedent himself executed the original insurance application and paid, with community funds, all of the premiums, the policies from their inception were owned solely by the decedent's three children. The October 1960 policy matured as a result of the decedent's accidental death, and his three children, as beneficiaries under the policy, received the $250,000 proceeds. Plaintiffs Mrs. Daisy Miller Boyd Bel and Richard E. Gerard, as executors of the decedent's estate, duly filed an estate tax return, in which they omitted from the deced-

Richard E. Gerard, Lake Charles, La., Leon J. Reymond, Jr., New Orleans, La., for appellants.

ent's gross estate an amount equal to John Bel's community share of the policy proceeds. The Commissioner of Internal Revenue thereafter assessed a deficiency, which resulted in part from a determination that the accidental death policy had been transferred by the decedent to his children in contemplation of death. The plaintiffs paid the deficiency, filed a claim for refund, and then instituted this suit.

With respect to the accidental death policy, the district court held (1) that the taxpayers failed to discharge their statutory burden of proving that the decedent's purchase of the policy was not a transfer in contemplation of death within the meaning of 26 U.S.C.A. § 2035, and (2) that the amount includable in the decedent's gross estate as a result of this transfer in contemplation of death was the purchase price of the policy (premiums paid), rather than its matured value at the time of decedent's death (insurance proceeds). 310 F.Supp. 1189. On appeal, the taxpayers assert that the former holding of the district court is erroneous, while the government contends that it is the latter ruling that is incorrect as a matter of law. We affirm the district court's conclusion that the decedent's purchase of the accidental death policy was a transfer in contemplation of death, but we reverse its holding that only the policy premiums are includable in the decedent's gross estate.

Section 2035(a) of the Internal Revenue Code of 1954 requires that a decedent's gross estate shall include the value of any property which the decedent at any time transferred in contemplation of death. 26 U.S.C.A. § 2035 (a). Appendant to this general principle is the statutory presumption of Section 2035(b), which provides that "[i]f the decedent within a period of 3 years ending with the date of his death . . . transferred an interest in property, . . . such transfer, . . . shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this sec-

tion . . . ." 26 U.S.C.A. § 2035(b). The underlying purpose of section 2035 is to prevent evasion of the federal estate tax by excising those transfers of a decedent which are essentially substitutes for testamentary dispositions. United States v. Wells, 1931, 283 U.S. 102, 116–117, 51 S.Ct. 446, 75 L.Ed. 867. Accordingly, the presumption embodied in section 2035(b) is rebuttable, for if a taxpayer can demonstrate that a donation made within the three-year period was not a substitute for a testamentary disposition, then the dominant purpose of section 2035 is not served by taxing such a transfer. Therefore, in every instance in which a transfer is effectuated within the statutory period, the crucial inquiry is whether or not the donation represents a testamentary substitute, or in statutory terminology, whether or not the transfer was made "in contemplation of death."

The phrase "in contemplation of death" does not encompass the general expectation of death which all mortals entertain. Rather, the Supreme Court has held that a transfer is made in contemplation of death only if the thought of death is the impelling cause of the transfer. Allen v. Trust Co. of Georgia, 1946, 326 U.S. 630, 635, 66 S.Ct. 389, 90 L.Ed. 367. Of course, the statutory presumption casts upon the taxpayer the burden of proof as to the dominant, controlling, and impelling motive of the decedent in making a transfer. This means that the taxpayer has the task of persuading a court that in transferring property the decedent was not motivated by purposes associated with the distribution of property in anticipation of death. Fatter v. Usry, E.D.La.1967, 269 F.Supp. 582. And, of course, whether or not any particular purpose was "the dominant, controlling or impelling motive is a question of fact in each case." Allen v. Trust Co. of Georgia, *supra,* 326 U.S. at 636, 66 S.Ct. at 392.

In assessing the determination of the court below, we first note that our scope of review is circumscribed by

the "clearly erroneous" standard of Rule 52(a). The district court found that the taxpayers herein failed to show by a preponderance of the evidence that the decedent's dominant motive in transferring the accidental death policy was not the thought of death. The record reveals that the plaintiffs introduced evidence tending to show that the decedent had established a policy of making gifts to his children during his lifetime, and that the purchase of the accidental death policy merely represented a continuation of this appanage. It is true that a transfer will not be considered in contemplation of death if a decedent's motive for the transfer was to fulfill a plan to distribute his property during his lifetime. United States v. Wells, *supra;* Landorf v. United States, 187 Ct.Cl. 99, 408 F.2d 461, 1969. Plaintiffs contend that they have shown the decedent's long-established policy of providing for his progeny and that the challenged transfer was merely a continuation of that policy. Therefore, they assert that the district judge's factual determination is clearly erroneous. But in addition to showing the decedent's history of generosity, the taxpayers introduced a considerable amount of evidence tending to show that the decedent's purpose in effectuating the challenged transfer was to avoid estate taxes. Indeed, the decedent's wife, his bookkeeper, and his secretary all testified that the decedent's reason for placing title to the accidental death policy in his children was to "get the proceeds out of his estate."

A transfer is in contemplation of death when made with the dominant purpose of avoiding death taxes. Allen v. Trust Co. of Georgia, *supra,* 26 C.F.R. § 20.2035–1(c). As noted above, the district court found, in effect, that the decedent's purchase of the accidental death policy was death-motivated. When confronted with the record testimony concerning the decedent's desire to avoid estate taxes, we can only conclude that the trial judge was not clearly erroneous in his assessment of the decedent's *dominant* motive. While the only certainties in life might be death and taxes, the tax reaper cuts his swath within section 2035 when the conjunction of these certitudes has a contrived rather than an aleatory positivism. The trial court found such predesigned positivity, and we have no warrant either in fact or in law to veto this finding. The trial judge had before him the entire panoply of a life, complete with its familial ties and relationships. We agree with the taxpayers' assertion that a decedent's kindness, love, thoughtfulness, and planning are all matters to be considered in determining whether or not a gift was made in contemplation of death. But, absent an evidential vacuum or clear error, the final judgment as to motivation must come from the judicial gridiron, and not from armchair quarterbacks' reading of the game in Sunday's paper. Therefore, we affirm district court's holding that the decedent's purchase of the accidental death policy was a transfer made in contemplation of death.

In determining *what* the decedent had transferred to his children as a result of his purchase of the accidental death policy, the district court concluded that only the dollar amount of the policy premiums was includable in the decedent's gross estate. In disposing of this issue the district court relied entirely upon the Tax Court case of Estate of Coleman v. Commissioner, 1969, 52 T.C. 921. In *Coleman* the decedent's children purchased, more than four years prior to the decedent's death, a life insurance policy on her life. The children were the record owners and beneficiaries of the policy, but the decedent paid all of the premiums. While the taxpayers and the Commissioner agreed that approximately one-third of the policy premiums had been paid in contemplation of death, the government, on the basis of Revenue Ruling 67–463, 1967, 2 Cum.Bull. 327, contended that the amount to be included in the decedent's gross estate was a pro rata portion of the policy proceeds based on the amount of premiums that the decedent had transferred in contem-

plation of death.[1] The Tax Court rejected this argument. The Court noted that prior to a 1954 amendment, the Internal Revenue Code provided that proceeds of an insurance policy on the life of a decedent which were receivable by beneficiaries other than the decedent's executor were includable in the decedent's gross estate in the proportion that the amount of premiums or other consideration paid directly or indirectly by the decedent bore to the total amount of the premiums paid for the insurance. In 1954 Congress altered the taxability of life insurance by providing in 26 U.S.C.A. § 2042 that includability of the proceeds of life insurance in a decedent's gross estate depends solely upon the decedent's retention of incidents of ownership in the policy. The congressional rejection of the premium-payment test persuaded a majority of the Tax Court in *Estate of Coleman* to conclude that a mere payment of premiums by a decedent could not operate as a transfer of an interest in the proceeds of insurance. In addition, the Tax Court stated:

> "The purpose of section 2035 is to prevent the avoidance of estate tax through the use of gifts as a substitute for testamentary disposition of what would otherwise be included in the gross estate. Milliken v. United States, 283 U.S. 15, 51 S.Ct. 324, 75 L.Ed. 809 (1931); see Liebman v. Hassett, 148 F.2d at 251. The focus, therefore, must be on what the decedent parted with as a result of her payment of the premiums in contem-

plation of death. Decedent held no interest whatsoever in the policy or its proceeds. Her children were the sole owners of the policy and only they could deal with rights and benefits flowing therefrom. To be sure, these payments kept the economic substance of that ownership alive. But the decisive point is that what these payments created or maintained was theirs and not hers. In these circumstances, we can see no basis for concluding that there was a constructive transfer of an interest in the policy. The only thing diverted from her estate was the actual money paid."

52 T.C. at 923.

In the instant case the district court concluded that the Tax Court's rejection of Revenue Ruling 67–463 in *Estate of Coleman* was controlling on the issue of whether or not any of the proceeds of the accidental death policy should be included in the decedent's gross estate. Furthermore, as an independent basis for its decision the court below quoted the above language from the *Coleman* case. On appeal the government asserts that the facts in *Coleman* are clearly distinguishable from those in the present case and that the Tax Court decision should not be considered controlling. The taxpayers, however contend that the uniform rejection of Revenue Ruling 67–463 by the judiciary dictates affirmance of the district court's holding on this matter.[2] For a variety of reasons we are unable to agree with taxpayers' position.

---

1. Revenue Ruling 67–463, 1967, 2 Cum. Bull. 327, provides in part:

 "In view of the foregoing, it is concluded that where a decedent, within three years of the date of death and in contemplation of death, made premium payments on a policy of insurance on his life, the incidents of ownership in which were transferred more than three years prior to his death, such payment was a transfer of an interest in the policy measured by the proportion the amount of premiums so paid bears to the total amount of premiums paid. Accordingly, the value of that

proportion of the amount receivable as insurance that the premiums paid within three years of death bear to the total premiums paid is includible in the decedent-insured's gross estate under the provisions of section 2035 of the Code."

2. Revenue Ruling 67–463 has also been rejected in First National Bank of Midland v. United States, 5 Cir. 1970, 423 F.2d 1286, and in Gorman v. United States, E.D.Mich.1968, 288 F.Supp. 225. The Fifth Circuit case is distinguishable on its facts from the case under consideration. *See* note 3 *infra*.

■ In arguing that this court should affirm the lower court's ruling that no part of the insurance proceeds is includable in decedent's gross estate, the taxpayers would have us apply a section of the Code dealing with lemons (section 2042), to one pertaining to oranges (section 2035). Section 2042, which deals strictly with life insurance, provides, *inter alia*, that a decedent's gross estate shall include the value of the proceeds of life insurance policies on which the decedent possessed at his death any of the incidents of ownership. However, section 2035 provides that *all property* which is transferred in contemplation of death is includable in a decedent's gross estate. We do not think that these two code provisions were designed or conceived to be read in *pari materia*. They came into being at different times, their respective targets were diverse, and we perceive no philosophic confluence to twin them. Therefore, we conclude that congressional rejection of the premium-payment test for purposes of section 2042 is foreign to the proper application of section 2035 to the instant case.

More importantly, however, we think that the district court erred in failing to recognize the fundamental factual differences between the case *sub judice* and Estate of Coleman v. Commissioner, *supra*. In *Coleman* the premium payments were made on a policy that was brought into existence more than three years prior to the decedent's death. Thus, the original contractual rights and ownership of the policy in *Coleman* were created outside the presumptive period, and, as the Tax Court noted, those premiums paid in contemplation of death served only to keep "the economic substance of that ownership alive." In the instant case, however, the premium paid by the decedent less than one year prior

to his death engendered the entire right, title, and interest which the decedent's children had in the accidental death policy. Essentially, every stick in the bundle of rights constituting the policy and its proceeds had its genesis within three years of the decedent's death. Therefore, we conclude that the Tax Court's rejection of the premium-payment test as the measurement of what the decedent transferred in contemplation of death is inapplicable to the factual situation in the instant case.[3]

■ Finally, we, unlike the district court, are not convinced that judicial inquiry should focus on what the decedent "parted with" as a result of his purchase of the accidental death policy in contemplation of death. As noted above, the Tax Court in *Coleman* reasoned that only the value of the premiums should be included in the donor's estate because "[t]he only thing diverted from [the] estate was the actual money paid." The district court adopted this "diversion" principle, since it concluded that the decedent's estate was reduced only by the dollar amount of the policy premiums. However, we decline to follow the *Coleman* standard in this case.

In Chase National Bank v. United States, 1929, 278 U.S. 327, 49 S.Ct. 126, 73 L.Ed. 405, the Supreme Court upheld the constitutionality of the estate tax imposed by §§ 401 and 402(f) of the Revenue Act of 1921, ch. 136, §§ 401, 402(f), 42 Stat. 277, 278. The Court concluded that the Act imposed a tax on a decedent's privilege of transferring property at his death and thus was not invalid because not apportioned as required by art. 1, §§ 2, 9, of the United States Constitution. The plaintiffs in *Chase*, however, asserted that the tax imposed on life insurance proceeds must be deemed to be a direct tax on property

---

3. Similarly, we conclude that First National Bank of Midland v. United States, 5 Cir. 1970, 423 F.2d 1286, wherein this court rejected Revenue Ruling 67–423 in a factual context essentially identical to the situation in *Coleman*, is inapposite because of factual differences with our case. There, as in the *Coleman* case, the insurance policy had been procured more than three years prior to the decedent's death.

because there was nothing to which a transfer or privilege tax could apply, since the beneficiaries' interests in the policies were not transferred to them from the decedent, but rather from the insurer. In answering this contention, the Supreme Court stated:

"Obviously, the word 'transfer' in the statute, or the privilege which may constitutionally be taxed, cannot be taken in such a restricted sense as to refer only to the passing of particular items of property directly from the decedent to the transferee. It must, we think, at least include the transfer of property procured through expenditures by the decedent with the purpose, effected at his death, of having it pass to another. Sec. 402(c) taxes transfers made in contemplation of death. It would not, we assume, be seriously argued that its provisions could be evaded by the purchase by a decedent from a third person of property, a savings bank book for example, and its delivery by the seller directly to the intended beneficiary on the purchaser's death, or that the measure of the tax would be the cost and not the value or proceeds at the time of death."

278 U.S. at 337, 49 S.Ct. at 128.

■■■■ We are cognizant of the decision in Gorman v. United States, E.D. Mich.1968, 288 F.Supp. 225, wherein a federal district court, in a factual setting indistinguishable from the case before this court, gave the Supreme Court's dictum short shrift in concluding that only the value of the premiums paid by the decedent are includable in his gross estate. The court in *Gorman* viewed the problem primarily as one of applicability of the premium-payment test in valuating the property transferred. Within this limited context the *Gorman* court concluded that the Supreme Court in *Chase* had never considered the relationship between premiums and proceeds, and therefore held the *Chase* language inapposite. Accordingly, the district court in *Gorman* held

that, for purposes of section 2035, the only asset transferred by the decedent in contemplation of death was the policy premium. We think that this result is an impermissibly restrictive interpretation of the term "transfer," for it essentially subverts the underlying purpose of section 2035.

In our opinion the broad legal principle enunciated by the Supreme Court in *Chase* is that the word "transfer" is not limited to the passing of property directly from the donor to the transferee, but encompasses a donation "procured through expenditures by the decedent with the purpose, effected at his death, of having it pass to another." Like the Supreme Court, we perceive little seriousness in the argument that a decedent should be permitted to evade the provisions of section 2035 by funneling property to various beneficiaries through a third-party conduit. Judicial sanctioning of such evasion, we think, would so frustrate the attempted taxation of testamentary substitutes that section 2035 would stand emaciated and skeletonized beyond congressional recognition. We recognize, of course, that John Bel never formally possessed any of the incidents of ownership in the accidental death policy. As noted above, however, we conclude that section 2042 and the incidents-of-ownership test are totally irrelevant to a proper application of section 2035. We think our focus should be on the control beam of the word "transfer." The decedent, and the decedent alone, beamed the accidental death policy at his children, for by paying the premium he designated ownership of the policy and created in his children all of the contractual rights to the insurance benefits. These were acts of transfer. The policy was not procured and ownership designated and designed by some goblin or hovering spirit. Without John Bel's conception, guidance, and payment, the proceeds of the policy in the context of this case would not have been the children's. His actions were not ethereally, spiritually, or occultly actuated. Rather, they constituted

worldly acts which by any other name come out as a "transfer." Had the decedent, within three years of his death, procured the policy in his own name and immediately thereafter assigned all ownership rights to his children, there is no question but that the policy proceeds would have been included in his estate. In our opinion the decedent's mode of execution is functionally indistinguishable. Therefore, we hold that the action of the decedent constituted a "transfer" of the accidental death policy within the meaning of section 2035, and that the district court erred in failing to include John Bel's community share of the proceed value of the policy in his gross estate.

## II. *The Compromise Agreement*

 Having disposed of the controversy concerning the decedent's non-testamentary donation, we now direct our attention to one of the parties' disputes involving his testamenary dispositions. In his last will and testament the decedent bequeathed to his widow one-half of his separate property and the usufruct of his share of the community property. The remainder of his estate was left in trust for the benefit of his three children.. Under Louisiana's forced heirship laws the decedent's disposable estate was limited to one-third of his property.[4] Since the decedent attempted to dispose of more than one-third of his total estate, his three children, with forced heirship rights to two-thirds of his estate, possessed the indefeasible right to reduce the decedent's bequest to his widow. In lieu of exercising their legitime, however, the children entered into a Notarial Act of Compromise, in which they agreed to "waive and renounce any right which

they have or may appear to have to contest or oppose the bequest made by John Albert Bel to Daisy B. Bel. . . ." In the estate tax return the plaintiffs claimed a marital deduction equal to one-half the value of decedent's adjusted gross estate. In his deficiency notice the Commissioner reduced the marital deduction to the net disposable portion of the estate available to the decedent under the laws of Louisiana. The district court agreed with the government and held that only the value of the property which the decedent was permitted by Louisiana law to leave to his widow qualified for the marital deduction under section 2056. The district court noted that the taxpayers were entitled to a marital deduction in an amount equal to the value of property "which passes or has passed from the decedent to his surviving spouse." 26 U.S.C.A. § 2056(a). In determining that only one-third of the decedent's estate had "passed" to the surviving spouse, the district court relied upon the disclaimer provision in effect at the time of the decedent's death. That provision provided:

"If under this subsection an interest would, in the absence of a disclaimer by any person other than the surviving spouse, be considered as passing from the decedent to such person, and if a disclaimer of such interest is made by such person and as a result of such disclaimer the surviving spouse is entitled to receive such interest, then such interest shall, for the purposes of this subsection, be considered as passing, not to the surviving spouse, but to the person who made the disclaimer, in the same manner as if the disclaimer had not been made."

Revenue Act of 1948, c. 168, Title III, § 361(a), 62 Stat. 117.[5] Essentially,

---

4. La.Civ.Code Ann. art. 1493 (1952) provides in part:

"Donations *inter vivos or mortis causa* can not exceed two-thirds of the property of the disposer, if he leaves, at his decease, a legitimate child; one-half, if he leaves two children; and one-third, if he leaves three or a greater number."

5. In 1966 the provisions of section 2056 (d) (2) of the Internal Revenue Code of 1954 were amended to provide that if an interest passes to a surviving spouse as a result of a disclaimer, then, for purposes of the marital deduction, the interest shall be considered as passing from the decedent to the surviving spouse if the disclaimer is made before the date

the district court reasoned that the decedent's three children, as forced heirs, were vested at the instant of the decedent's death with the right to receive their legitime, and that this legitime was inherited from the decedent within the meaning of section 2056(e) (2). Furthermore, the district court concluded that since the children, by means of the Notarial Act of Compromise, disclaimed their legitime in favor of their mother, the above disclaimer provision limited the estate to a marital deduction in an amount equal to that portion of the decedent's property which was immune from the children's claim as forced heirs. While we are in complete agreement with the district court's holding that the forced heirs' legitime was an interest inherited by the children from the decedent within the purview of section 2056(e) (2), we cannot accede to the application of the disclaimer provision in this case.

■ In our opinion the decedent's children did not "disclaim" any interest in their father's estate by virtue of the Notarial Act of Compromise. Given its ordinary and commonly understood meaning, the word "disclaimer" has been defined as:

"* * * the repudiation or renunciation of a claim or power invested in a person for which he formally alleged to be his. The refusal, or rejection of an estate or right offered to a person. The disavowal, denial, or renunciation of an interest, right, or property imputed to a person or alleged to be his."

City Nat'l Bank & Trust Co. v. United States, S.D. Ohio 1962, 203 F.Supp. 398, 402 aff'd, 6 Cir., 312 F.2d 118, cert. denied, 1963, 373 U.S. 949, 83 S.Ct. 1679, 10 L.Ed.2d 705. In our opinion a disclaimer, which contemplates a unilateral act, is the antonym of a *quid pro quo*. In a supplementary Senate Report on the Revenue Act of 1948 the Senate Com-

mittee on Finance defined disclaimer as an unqualified refusal to accept the rights to which one is entitled and noted that "[i]f a person uses these rights for his own purposes as by receiving a consideration for his formal disclaimer he has not refused the right to which he was entitled." 2 U.S.Code Cong. Service, p. 1226 (1948). Accordingly, a person does not disclaim his rights when he refuses to exercise them for the purpose of serving his own interests.

In the instant case the decedent's children in the Notarial Act of Compromise were not engaged in the solo performance characteristic of a disclaimer, but rather in a play in which their mother was assigned a leading role. By the express terms of the agreement, the children agreed to renounce their forced heirship rights in exchange for the widow's surrendering her cash usufruct and the proceeds on production accruing to the decedent's one-half community share of mineral royalty interests. We believe that this bilateralism between the widow and her children negates the existence of a disclaimer of the children's forced heirship rights. Since the decedent's children received a consideration for their refusal to exercise their rights, we conclude that the disclaimer provision applied by the court below is inapplicable to the Notarial Act of Compromise.

Our conclusion that the disclaimer provision is irrelevant does not necessarily mean that the taxpayers merit a marital deduction in the claimed amount. In fact, on the basis of the record before us we are unable to determine the precise amount to which the plaintiffs are entitled. Our inability stems not from any uncertainty as to the legal principles that should be applied, but rather from an absence of relevant factual determinations by the district court.

■ As previously noted, we agree with the district court's holding

prescribed for filing the estate tax return and if the person making the disclaimer does not accept any interest in

the property before disclaiming. Act of October 4, 1966, Pub.L. No. 89–621, § 1 (a), 80 Stat. 872.

that the children's forced heirship rights constituted an interest inherited by them from the decedent under the provisions of section 2056(e) (2) of the Code. Without more the very existence of the children's forced heirship rights would prohibit the taxpayers from claiming a marital deduction in an amount greater than the value of the decedent's net disposable estate. *See* 26 U.S.C.A. § 2056 (b) (1) (A). However, under section 2056(e) property interests can be considered as passing or having passed to a decedent's surviving spouse, under the terms of the following regulation:

> "If as a result of the controversy involving the decedent's will, or involving any bequest or devise thereunder, a property interest is assigned or surrendered to the surviving spouse, the interest so acquired will be regarded as having "passed from the decedent to his surviving spouse" only if the assignment or surrender was a bona fide recognition of enforceable rights of the surviving spouse in the decedent's estate. Such a bona fide recognition will be presumed where the assignment or surrender was pursuant to a decision of a local court upon the merits in an adversary proceeding following a genuine and active contest. However, such a decree will be accepted only to the extent that the court passed upon the facts upon which deductibility of the property interests depends. If the assignment or surrender was pursuant to a decree rendered by consent, or pursuant to an agreement not to contest the will or not to probate the will, it will not necessarily be accepted as a bona fide evaluation of the rights of the spouse."

26 C.F.R. § 2056(e)–2(d) (2). In this case we are unable to conclude as a matter of law that the Notarial Act of Compromise, which is essentially a settlement agreement, was consummated as a result of a "controversy" between the widow and her children. We have held that parties' adverse interests in a de-

cedent's estate and a resulting settlement achieved at the conclusion of arm's length negotiations are sufficient to evidence the existence of a "controversy" within the meaning of the above regulation. Citizens & Southern National Bank v. United States, 5 Cir. [451 F.2d 221, 1971]. In *Citizens & Southern* we stated that the "will controversy" regulation does not "encompass[es] only those settlements achieved at the end of an armageddon." *Id.* at 226. But by the same token we think that, for purposes of the regulation, there must be at least a skirmish between the settling parties. The record in this case contains some evidence tending to show that the respective parties to the settlement agreement were not playing adversary roles and that the compromise was not achieved as a result of arm's length negotiations. Since we cannot determine whether true adversary positions were taken by the parties or whether the settlement was nothing more than a "sweetheart" contract, we must remand this issue to the district court for a finding on whether or not a genuine "controversy" existed between the parties. If, upon remand, the district judge finds that the settlement agreement was generated by a bona fide controversy, then he must also determine as a factual matter whether or not the children's surrender of their forced heirship rights "was a bona fide recognition of enforceable rights of the surviving spouse in the decedent's estate" in terms of the regulation. *See* Estate of Barrett v. Commissioner, 1954, 22 T.Ct. 606. Of course, we leave to the sole discretion of the district judge whether or not to confine his inquiry to the existing record.

### III. *The Louisiana Estate Tax Apportionment Statute*

▮▮▮ The third and final issue in this tax appeal involves the interrelationship among the estate tax marital deduction, the Louisiana Estate Tax Apportionment statute, 3A La.Rev.Stat. Ann. § 9:2432, subd. B (1965), and Lou-

isiana's forced heirship laws. The decedent provided in his will that the residue of his estate, which was left in trust to his three children, should bear the total federal estate tax due on his estate. In his deficiency notice to the taxpayers, the Commissioner allocated a portion of the estate tax against both the children's inheritance and the amount which the Commissioner determined qualified for a marital deduction. The taxpayers raised the issue concerning the application of the estate tax apportionment statute for the first time in their motion for entry of judgment filed subsequent to the district court's rendering a decision on the other issues and after the taxpayers and the government were unable to agree upon a computation for judgment. Essentially, the taxpayers argued that the Commissioner's allocation of the federal estate tax was in violation of the Louisiana Estate Tax Apportionment statute, which states in part that if a deceased provides in his will "for the apportionment of the tax among all the persons interested in the estate, the court shall apportion the tax as directed by the deceased." 3A La. Rev.Stat.Ann. § 9:2432, subd. B (1965). After the taxpayers' motion for judgment was filed the government objected to the trial court's consideration of the Commissioner's allocation of the federal estate tax, asserting that the taxpayers' failure to raise that issue in their original claim for refund foreclosed judicial determination of the matter in a later refund suit. In the alternative, the government argued that application of the estate tax apportionment statute in the instant case would operate to defeat the legitimate rights of the decedent's children in violation of Louisana's forced heirship laws. The district court held that the plaintiffs were precluded from raising the issue concerning the Commissioner's allocation of the federal estate tax, and that even if they were not so precluded, the estate tax apportionment statute could not be applied in the instant case in violation of Louisiana's forced heirship provisions. We agree

with the court below that plaintiffs are precluded by statute from raising this issue in their suit for refund without first presenting it to the Commissioner in their claim for refund. Accordingly, we express no opinion on the merits of taxpayers' claim.

Section 7422(a) of the Internal Revenue Code of 1954 provides:

"No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary or his delegate, according to the provisions of law in that regard, and the regulations of the Secretary or his delegate established in pursuance thereof."

26 U.S.C.A. § 7422(a). The regulations enacted pursuant to this statutory provision state that no refund will be allowed except upon one or more of the grounds set forth in a timely filed claim, and that any such claim "must set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof." 26 C.F.R. § 301.6402-2(b) (1). In Tucker v. Alexander, 1927, 275 U.S. 228, 48 S.Ct. 45, 72 L.Ed. 253, the Supreme Court stated that the government may insist upon literal compliance with the statute and the regulations. In this case we do not think that the taxpayers in their claim for refund properly raised the issue concerning the Commissioner's apportionment of the federal estate tax.

With respect to the Commissioner's computation of the marital deduction, the taxpayers in their claim for refund stated:

"Claimants contend that the adjustment made by the examiner is erroneous in that the full marital deduction of $1,088,990.32 (being one-half of the decedent's adjusted gross estate)

should be allowed under the last will and testament of the decedent, which bequeathed to his surviving spouse ½ of decedent's separate property, instead of $917,639.38 (being the net disposable portion as calculated by the examiner plus insurance of $284,636.-16 to surviving wife). The fact that decedent's children had the right to reduce this bequest to the net disposable portion is of no consequence because the children did not in fact assert their legitime. A bequest in excess of the legitime is not null, but only reducible by the forced heirs of their option (Louisiana Civil Code Articles 1502 et seq.), and the right to assert the legitime is personal to the forced heir. Alternatively, claimants contend that the interest received by the surviving spouse should be reduced only by ($8,510.43) the value of the property interest surrendered by her in settlement of the respective rights of the legatee and the forced heirs. Regulation Section 20.2056(e)–2(d)(1)."

In our opinion this portion of the claim, fairly read, does not raise the issue concerning apportionment of the federal estate tax. Essentially, the Commissioner's apportionment of the estate tax operated to reduce the decedent's net disposable estate. In their claim for refund we do not understand the taxpayers to be contending that the Commissioner incorrectly determined the decedent's net disposable estate, but only that the marital deduction should not be limited to the decedent's disposable portion. We think that raising the issue as to whether or not the marital deduction should be limited to the decedent's disposable estate does not constitute a challenge to the correctness of the Commissioner's computation of the amount of that estate. *Cf.* Alabama By-Products Corp. v. Patterson, 5 Cir. 1958, 258 F.2d 892, cert. denied, 1959, 358 U.S. 930, 79 S.Ct. 318, 3 L.Ed.2d 303. Moreover, if plaintiffs, by virtue of the above claim, intended to challenge the Commissioner's allocation of the estate tax, then we think

that they failed to state facts sufficient to apprise the Commissioner of the exact basis of this claim, since the quoted portion contains no mention whatsoever as to apportionment of the estate tax in general or the application of the Louisiana Estate Tax Apportionment statute in particular. Finally, we do not think that the taxpayers ever intended to raise the estate tax apportionment issue in their claim for refund, for not only did the plaintiffs fail to include such issue in their complaint, but they did not raise the issue until subsequent to the district court's determination of all other issues and only after the taxpayers and government had reached an impasse in the computation of the judgment. Under these circumstances we conclude that the district court was correct in dismissing the taxpayers' claim concerning the Commissioner's apportionment of the federal estate tax, and that that portion of its judgment is accordingly affirmed.

For the foregoing reasons, the case is remanded to the district court for further proceedings not inconsistent with this opinion.

Affirmed in part and remanded in part.