Max E. KAHN and J. M. Hertz, as Executors of the Estate of Max Jerald Kahn, Deceased,

v.

The UNITED STATES of America.

Max E. KAHN, as Administrator of the Estate of Gail O. Kahn, Deceased,

v.

The UNITED STATES of America.

Civ. A. Nos. 15738, 15739.

United States District Court,
N. D. Georgia,
Atlanta Division.

Aug. 31, 1972.

Sutherland, Asbill & Brennan, Michael J. Egan, Jr., R. Kent Frazier, John B. Miller, Jr., Atlanta, Ga., for plaintiffs.

Scott P. Crampton, Asst. Atty. Gen., Jerome Fink and Lawrence R. Jones, Jr.,

Attys., Dept. of Justice, Washington, D. C., John W. Stokes, Jr., U. S. Atty., Atlanta, Ga., for defendant.

## OPINION

EDENFIELD, District Judge.

These consolidated cases, which were tried before the court sitting without a jury, involve a close question of federal estate tax law which has been the subject of much recent litigation. Convinced that a young married couple in excellent health facing a bright and secure future contemplated everything but the angel of death and his tax law counterpart, the court will order the Government to refund to their estate money it has erroneously collected.

The facts, both as stipulated and as found by the court, are that in 1962 Meyer Balser, an insurance broker, suggested to Max E. Kahn, head of Empire Distributors, Inc. ["Empire"], that Empire take out a group insurance policy for key personnel covering accidental death, dismemberment, and disability. Balser did not approach any other officers or employees of Empire about this matter. Mr. Kahn thought the suggestion was in the best interests of Empire and he, alone, made the decision to accept it on behalf of the company. Balser placed the insurance with the Insurance Company of North America ["INA"] and the policy was taken out jointly by Empire and two other corporations controlled by Empire's stockholders. Coverage was offered in varying amounts to all employees of the three corporations and their spouses, other than warehouse personnel, and a total of 62 persons were eventually covered. All premiums due under the INA policy were paid by the three corporate employers and no contributions were made by any employee or spouse.

Among the persons eligible for coverage under the INA policy were Max Jerald Kahn ["Jerry"] and his wife Gail O. Kahn ["Gail"]. Jerry, the eldest son of Max E. Kahn, was being groomed by his father to take over the family business-

es. He was a vice-president of Empire and worked in the sales division. At the time the INA policy was taken out by Empire and the other corporations, Jerry was 26 years old, Gail was 25, and both were in excellent health. Jerry was a sports enthusiast but he did not engage in any hazardous activities, and Gail spent most of her time at home with their two children. A third child was born to them in August, 1963. At the time, Jerry owned several policies of insurance covering his life which had a total face amount exceeding $193,000 and which named Gail as primary beneficiary. Gail owned no life insurance at the time, but in April 1963 she purchased a policy in the face amount of $10,000 which named Jerry as primary beneficiary. In 1959, when Jerry purchased a home, his family attorney advised him to execute a will and later mailed Jerry a draft will for his consideration. Nevertheless, Jerry had not executed a will at the time the INA policy took effect and did not get around to doing so until May 1963. Gail never executed a will.

After Empire and the other corporations had taken out the INA policy, Balser distributed some forms to a number of Empire employees who were eligible for coverage. Each form was entitled "Certificate of Insurance" and consisted of a description of the coverage and an application for coverage under the terms of the master policy. The employee merely had to fill in his name, address, place and date of birth, occupation, amount of insurance and method of settlement desired, beneficiary, and beneficiary's relationship, date of application, and signature. The name of the policyholder (Empire), the number of the policy, and a policy aggregate limit for a particular type of accident were already inserted on each form when the employee received it.

Mr. Balser, who was a close friend of Gail's family and knew both Gail and Jerry from their youth, personally delivered the INA forms to Jerry. He told Jerry that Jerry should make Gail the

owner of the certificate and beneficiary under the policy covering Jerry and that Gail should make Jerry the owner of the certificate and beneficiary under the policy covering her. Balser did not give Jerry any reason for his recommendation, nor did Jerry ask for one. Jerry merely said something to the effect, "Meyer, I'll leave it all up to you." Balser had never had a serious discussion with Jerry about estate planning, although he did at one time compile a life insurance analysis for him, and he made no mention of either estate planning or estate taxes to Jerry on this occasion or thereafter. Mr. Balser had no discussion with Gail about the INA forms, and he never discussed estate planning or estate taxes with her. Although as an insurance agent Mr. Balser did discuss estate planning with his clients insofar as it related to their insurance programs, he did so only when it was appropriate to the client's age and estate, and he felt since Jerry and Gail were young and their estate relatively modest there was no need to discuss estate planning with them. Neither Jerry nor Gail asked Mr. Balser about the estate tax effect of his recommendation concerning the INA forms.

On November 6, 1962, Jerry applied for insurance in the principal sum of $100,000 covering accidental loss of life, limb, or sight as well as permanent total disability as defined in the master policy, and Gail applied for insurance in the principal sum of $50,000 covering accidental loss of life, limb, or sight. Both Jerry and Gail left blank spaces next to the words "beneficiary" and "relationship" on the application portion of the INA forms, although otherwise they completed the application forms in full. On November 18, coverage under the INA master policy commenced. Since the previous group policy covering the employees of Empire and the other two corporations had expired November 18, 1962, the three corporations had purchased interim coverage under the INA policy from November 18 to December 1, 1962 which was evidenced by a separate

rider. On November 28, 1962 Jerry and Gail executed INA forms entitled "Beneficiary Designation." Jerry designated Gail as owner of the certificate of insurance for which he had applied and beneficiary under the policy, and Gail designated Jerry as owner of the certificate for which she had applied and beneficiary under the policy. INA acknowledged receipt of these forms that same day. On December 1, 1962 the INA policy became fully effective.

On December 29, 1963, while they were visiting Jacksonville, Florida on a pleasure trip, Jerry and Gail Kahn died simultaneously in a fire at the Hotel Roosevelt. The proceeds under the INA policy were paid in equal shares to the contingent beneficiaries, their three children.

Timely estate tax returns were filed on behalf of the two estates by the legal representatives and the two INA certificates of insurance were disclosed on those returns as having no ascertainable value at the time of death. Following an audit, the Commissioner of Internal Revenue assessed a deficiency of $13,995.67 plus interest of $2,436.78 against Jerry's estate on the theory that the proceeds of the policy covering Gail were includable in Jerry's estate as owner-beneficiary and increased its value by $50,000, and assessed a deficiency against Gail's estate in the amount of $27,917.75 plus interest of $4,890.19 on the theory that the proceeds of the policy covering Jerry were includable in Gail's estate as owner-beneficiary and increased its value by $100,000. The deficiency assessments were paid, and the timely claims for refund filed by the representatives of the two estates were disallowed by the District Director of Internal Revenue in Atlanta. The representatives brought suit in this court pursuant to 28 U.S.C. § 1346(a)(1) (1970).

The Government does not seek to support the deficiency assessments on the grounds asserted by the Commissioner. Instead, the Government contends that the $100,000 INA certificate of insur-

ance covering Jerry was transferred by him to Gail in contemplation of death within the meaning of Section 2035 of the Internal Revenue Code of 1954 and that the $50,000 INA certificate covering Gail was similarly transferred by her to Jerry. Under this theory, the $100,000 proceeds payable by reason of Jerry's death were includable in Jerry's estate rather than Gail's and the $50,000 proceeds payable by reason of Gail's death were includable in Gail's estate rather than Jerry's. Plaintiffs contend that there were no transfers of anything in these cases, but that even if the certificates were transferred they were not transferred in contemplation of death within the meaning of Int.Rev.Code of 1954, § 2035.

Section 2035 provides as follows:

"(a) General Rule.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, in contemplation of his death.

"(b) Application of General Rule. —If the decedent within a period of three years ending with the date of his death (except in case of a bona fide sale for an adequate and full consideration in money or money's worth) transferred an interest in property, relinquished a power, or exercised or released a general power of appointment, such transfer, relinquishment, exercise, or release shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section and sections 2038 and 2041 (relating to revocable transfers and powers of appointment); but no such transfer, relinquishment, exercise, or release made before such three-year period shall be treated as having been made in contemplation of death."

Treasury Regulation § 20.2035–1 (1958) provides:

"(c) *Definition.* The phrase 'in contemplation of death', as used in this section does not have reference to that general expectation of death such as all persons entertain. On the other hand, its meaning is not restricted to an apprehension that death is imminent or near. A transfer 'in contemplation of death' is a disposition of property prompted by the thought of death (although it need not be solely so prompted). A transfer is prompted by the thought of death if (1) made with the purpose of avoiding death taxes, (2) made as a substitute for a testamentary disposition of the property, or (3) made for any other motive associated with death. The bodily and mental condition of the decedent and all other attendant facts and circumstances are to be scrutinized in order to determine whether or not such thought prompted the disposition."

■ The court agrees with the Government that on November 28, 1962 Jerry transferred his INA certificate of insurance to Gail and she transferred her INA certificate to him within the meaning of Section 2035. The application for a policy of insurance made by Empire to INA, which formed part of the contract of insurance between Empire and INA, bound INA to insure from the effective date of coverage all eligible employees and spouses who made their own written applications on or before that date. Under the policy and the rider attached thereto the effective date of coverage was November 18, 1962. Since both Jerry and Gail made applications for certificates of insurance on November 6, it would appear that INA was bound to insure them as of November 18 and that as of that date Jerry had a vested interest and "owned" the INA certificate of insurance for which he had applied and Gail had a vested interest and "owned" the INA certificate for which she had applied. Although neither of them had, at that point, designated a beneficiary,

they each had the power to do so. If either or both had suffered accidental loss of life or limb between November 18 and November 27, 1962, INA would have paid the proceeds in a manner described in the certificate of insurance. Accordingly, when Jerry, on November 28, designated Gail as the owner of his certificate and beneficiary under the policy, he "transferred an interest in property" to her. Similarly, when Gail, that same day, designated Jerry as the owner of her certificate and beneficiary under the policy, she "transferred an interest in property" to him.

Even if Jerry and Gail had not possessed incidents of ownership in their respective certificates the court would hold that they transferred an interest in property to each other within the meaning of § 2035. In Bel v. United States, 452 F.2d 683, 691 (5th Cir. 1971), cert. denied, 406 U.S. 919, 92 S.Ct. 1770, 32 L.Ed.2d 118 (1972), the decedent executed an insurance application for an accidental death policy, paid all the premiums from community funds, and placed ownership of the policy in his three children. The Fifth Circuit, defining the term "transfer" in § 2035 to include "the transfer of property procured through expenditures by the decedent with the purpose, effected at his death, of having it pass to another", Chase National Bank of City of New York v. United States, 278 U.S. 327, 337, 49 S.Ct. 126, 128, 73 L.Ed. 405 (1929), held that the decedent had transferred the policy to his children within the meaning of § 2035 by designating ownership and creating in the children all of the contractual rights to the insurance benefits. The court stated that the decedent, who had paid the premiums on the policy and then "beamed" it at his children, could not evade § 2035 by funneling the property through a third-party conduit.

Similarly, in the present case Jerry designated ownership of the INA certificate for which he had applied in Gail and created in her all of the contractual rights flowing from that certificate when he completed the "Beneficiary Designation" form on November 28, and Gail designated ownership of the INA certificate for which she had applied in Jerry that same day in the same manner. True, neither had "procured" the certificates for which they applied "through expenditures" such as the payment of premiums. However, Jerry received the certificate-application only because he continued in the employ of Empire, and Gail received a certificate-application only because she continued as the spouse of an eligible employee. Thus each gave consideration for the certificates, even though Empire paid the premiums. See Estate of Porter v. C.I.R., 442 F.2d 915 (1st Cir. 1971).

■ Having concluded that Jerry and Gail effectuated transfers within three years of the date of their deaths, the court must determine whether those transfers represented testamentary substitutes. Bel v. United States, *supra*. In this regard the statutory presumption created by death within three years of the transfer is not evidence of a motivation to effect a testamentary substitute, Hull's Estate v. C.I.R., 325 F.2d 367 (3d Cir. 1963), but merely casts upon plaintiffs the burden of persuading the court by a preponderance of the evidence that the thought of death or purposes associated with the distribution of property in anticipation of death were not the dominant, controlling, or impelling motives behind the transfers. Allen v. Trust Co. of Georgia, 326 U.S. 630, 66 S.Ct. 389, 90 L.Ed. 367 (1946); Bel v. United States, *supra*; Hull's Estate v. C.I.R., *supra*. The focus of the court's inquiry must be upon the state of mind of Jerry and the state of mind of Gail at the time the transfers were made, United States v. Wells, 283 U.S. 102, 117, 51 S.Ct. 446, 75 L.Ed. 867 (1931), and circumstantial evidence may be determinative. See Landorf v. United States, 408 F.2d 461, 473, 187 Ct.Cl. 99 (1969).

At the time of the transfers both Jerry and Gail were young and perfectly healthy. Jerry had a reasonable life expectancy of an additional 44.5 years and

Gail an additional 51.9 years. They had two children, aged two years and one year, and a third child was born only nine months later. Neither had engaged in any significant estate planning. Jerry had not executed a will, even though he owned a home, had two children, and was expecting a third, and neither had Gail. Although insurance policies in the aggregate face amount of over $193,000 covering Jerry's life were in force at the time, all of those policies were owned by Jerry and were eventually included in his gross estate and subjected to tax. These factors portray a couple contemplating continued, vigorous life, not death or death taxes.

Neither Jerry nor Gail made an independent effort to seek coverage under the INA policy. It was only as a result of Mr. Balser's initiative that Jerry's father, on behalf of Empire and the other companies, considered obtaining coverage under that policy for his key employees and their spouses. All negotiations concerning the INA policy were conducted solely between Mr. Balser and Max E. Kahn, and it was Max E. Kahn's decision to give coverage to the employees and their spouses. Jerry and Gail were but two of 62 persons upon whom Empire bestowed the free bonus of coverage under the INA policy and to whom the certificate-application forms were distributed as a matter of course. Their decision to "apply" for coverage under the master policy cannot, under the circumstances, be associated with any thought of death.

It is uncontroverted that Jerry did not seek advice from either his family attorney or Mr. Balser as to how he and Gail should complete the INA certificate-application forms. It is also uncontroverted that Mr. Balser did not give Jerry any reason for telling him that he should place ownership of his INA certificate in Gail and that she should place ownership of her INA certificate in Jerry. Neither Jerry nor Gail discussed any aspect of estate planning with Mr. Balser at the time the transfers were suggested and made, nor did either of them ask Mr. Balser to explain why he had suggested that they transfer ownership of the certificates. Whatever may have been in Balser's mind when he made the suggestion was not communicated to Jerry or Gail and Balser's motives cannot be imputed to them. Estate of Nathalie Koussevitsky, 5 T.C. 650, 663–664 (1945), acquiesced in, 1945 Cum.Bull. 4. See Hoover v. United States, 180 F.Supp. 601, 148 Ct. Cl. 645 (1960). The court is fully persuaded by all the facts and circumstances that neither the thought of death nor any purposes associated with the distribution of property in anticipation of death, including the avoidance of estate taxes, were the "dominant, controlling, or impelling" motives behind the transfers.

The Government has argued that the implication of the *Bel* case is that the purchase and transfer of an accidental death policy is, by the very nature of the policy, a transfer in contemplation of death within the meaning of § 2035. It contends that since accidental death policies provide no benefits until death, and most, including the INA master policy in the instant cases, do not have cash surrender or loan values, it is almost inconceivable that a "life" motive could exist for their purchase or transfer.

The court cannot accept this argument. In the first place, the INA policy coverage was not limited to accidental death but covered loss of limb and, in Jerry's case, disability as well. The loss of limb and disability benefits were, of course, payable during the life of the insured. The nature of the INA policy certainly does not compel the conclusion that the "purchase" of the INA certificates by Jerry and Gail was motivated by the thought of death. In the second place, the Fifth Circuit, citing *Bel*, has repudiated the notion that the transfer of a policy insuring against the death of the insured is always inherently a transfer in contemplation of death within the meaning of § 2035. First National Bank at Lubbock v. United States, 463 F.2d 716 (5th Cir. 1972); Bintliff v. United

States, 462 F.2d 403 (5th Cir. 1972). Indeed, the Government's contention that the presumption clause in § 2035 is irrebuttable when a certain class of property is transferred runs squarely afoul of the Supreme Court's decision in Heiner v. Donnan, 285 U.S. 312, 52 S.Ct. 358, 76 L.Ed. 772 (1932), which declared unconstitutional such an irrebuttable presumption clause in a predecessor statute on the ground that it violated the due process clause of the Fifth Amendment.

The Government also argues that plaintiffs have the burden of proving affirmatively that "life" motives were the "dominant, controlling, or impelling" motives behind the transfers and that they have not met their burden. Although § 2035 implies that the taxpayer may prevail even if he only *disproves* a *"death"* motive, certain language in the cases supports the Government's position that the taxpayer must affirmatively *prove* a *"life"* motive. Allen v. Trust Co. of Georgia, *supra,* 326 U.S. 635–636, 66 S.Ct. 389; First National Bank at Lubbock v. United States, supra; Bintliff v. United States, *supra;* Landorf v. United States, *supra,* 408 F.2d 472.

The language relied upon by the Government is evidently premised on the assumptions that (1) people transfer property only as a result of concrete motivation and (2) such motivation may be generally categorized as either "life" or "death" motivation. Although the court questions the correctness of these assumptions, it is satisfied that plaintiffs have proven "life" motives for the transfers. The circumstantial evidence in these cases leads the court to find that Jerry transferred ownership of his INA certificate to Gail simply because Meyer Balser told him to do so, and Gail transferred her INA certificate to Jerry simply because Jerry told her to do so. Jerry had every reason to perfunctorily follow Mr. Balser's suggestion because Mr. Balser was both an old friend of the family and an insurance specialist. Since there were no "death" motives involved in the transfers, it follows that the real "motives" for the transfers —Jerry's trust in Mr. Balser and his perfunctory acceptance of Mr. Balser's advice, and Gail's trust in Jerry and perfunctory acceptance of his advice—were "life" motives.

For the foregoing reasons the court concludes that the Government erroneously refused to refund to plaintiffs the money they claim, and plaintiffs should now prepare an appropriate order detailing the extent of their recovery for approval so that judgment may be entered in their favor.