**Dr. Mervin E. FATTER, Transferee Est. of Anthony A. Fatter, Transferor, Plaintiff,**

v.

**Chester A. USRY, District Director of Internal Revenue, Defendant.**

**Dr. Esmond A. FATTER, Transferee Est. of Mrs. Pauline J. Marchand Fatter, Transferor, Plaintiff,**

v.

**Chester A. USRY, District Director of Internal Revenue, Defendant.**

**Civ. A. Nos. 14188, 14189.**

United States District Court
E. D. Louisiana,
New Orleans Division.

June 14, 1967.

Harry R. Cabral, Jr., Metairie, La., Thomas J. Taylor, New Orleans, La., for plaintiffs.

Louis C. LaCour, U. S. Atty., Gene S. Palmisano, 1st Asst. U. S. Atty., Peter Winstead, Atty., Tax Division, for defendant.

RUBIN, District Judge:

The sons of Anthony A. Fatter and his wife, Pauline J. Marchand Fatter, contend that gifts to them by their parents were not made in contemplation of death and therefore that estate taxes paid with reference to these gifts should be refunded.

The defendant, sued in his capacity as District Director of Internal Revenue, assessed the tax under the provisions of Section 2035 of the Internal Revenue Code which provides, in relevant part, that: "The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer \* \* \* in contemplation of his death." That section further provides that a transfer made by the decedent within a period of three years before his death shall "unless shown to the contrary, be deemed to have been made in contemplation of death \* \* \*."[1]

The statute does not attempt to define the term "in contemplation of death."

But the regulations outline its meaning:

> The phrase 'in contemplation of death' as used in this section, does not have reference to that general expectation of death such as all persons entertain. On the other hand, its meaning is not restricted to an apprehension that death is imminent or near. A transfer 'in contemplation of death' is a disposition of property prompted by the thought of death (although it need not be solely so prompted). A transfer is prompted by the thought of death if (1) made with the purpose of avoiding death taxes, (2) made as a substitute for a testamentary disposition of the property, or (3) made for any other motive associated with death. The bodily and mental condition of the decedent and all other attendant facts and circumstances are to be scrutinized in order to determine whether

---

1. Section 2035(b), Internal Revenue Code of 1954, 26 U.S.C.A. 2035(b).

or not such thought prompted the disposition."[2]

 The court's inquiry then is into the mind of the decedent, into that "heap or collection of different perceptions."[3] Transfers prompted by the thought of death, even if they are also prompted by other motives, are includable in the gross estate. Transfers made for other reasons are not.

The motives that move men are often so obscure that it is difficult even for a man consciously probing his own mind to know what prompts him. Psychiatry tells us that cognition may be self-deceptive, that we often do not act on the basis of the thoughts we perceive, and that the subconscious may deceive even the man who thinks he knows his own mind. Man's true motives are often hidden from himself, hidden perhaps best from himself in some situations.

Intent is difficult to define; motive may be yet more secret. The law has traditionally sought to distinguish "motive" from "intent" on the basis that "motive * * * is notoriously difficult to establish and cannot, like intent, be inferred from a person's overt actions."[4] The tax law does not require us here to determine "motive" in those words, but it seeks an equally elusive shadow from the recesses of the mind of the deceased: did the thought of death prompt him to act?

 The dominant purpose of the statute is to reach substitutes for testamentary dispositions and thus to prevent evasion of the estate tax.[5] "As the transfer may otherwise have all the indicia of a valid gift inter vivos, the differentiating factor must be found in the transferor's motive. Death must be 'contemplated' that is, the motive which induces the transfer must be of the sort which leads to testamentary disposition. * * * The question, necessarily, is as to the state of mind of the donor."[6]

 But "the determinative motive" cannot be said to be lacking "merely because of the absence of a consciousness that death is imminent. It is contemplation of death, not necessarily contemplation of imminent death, to which the statute refers. It is conceivable that the idea of death may possess the mind so as to furnish a controlling motive for the disposition of property, although death is not thought to be close at hand."[7] The transfer is in contemplation of death where, for any reason, the decedent becomes primarily concerned about what will happen to his property at his death and as a result takes some action to control its disposition.[8] Since the thought of death as a controlling motive affords the test, "it follows that the statute does not embrace gifts inter vivos which spring from a different motive."[9]

 Courts and commentators have made frequent and, in some cases, lengthy efforts to isolate the criteria that can be used to determine whether or not a particular gift was made in contemplation of death.[10] No single criterion

2. Regulations, Section 20.2035–1(c), 26 CFR Section 20.2035–1(c).

3. Hume, A Treatise On Human Nature.

4. Royal Commission Report on Capital Punishment, pp. 63–64.

5. Nichols v. Coolidge, 1927, 274 U.S. 531, 47 S.Ct. 710, 71 L.Ed. 1184; Milliken v. United States, 1931, 283 U.S. 15, 51 S.Ct. 324, 75 L.Ed. 809; United States v. Wells, 1931, 283 U.S. 102, 51 S.Ct. 446, 75 L.Ed. 867; Heiner v. Donnan, 1932, 285 U.S. 312, 52 S.Ct. 358, 76 L.Ed. 772.

6. United States v. Wells, 1931, 283 U.S. 102, 117, 51 S.Ct. 446, 451, 75 L.Ed. 867, 875–876.

7. Ibid.

8. Allen v. Trust Company of Georgia, 1946, 326 U.S. 630, 66 S.Ct. 389, 90 L. Ed. 367. See also Mertens, Law of Federal Estate and Gift Taxation, § 22.06, p. 61 and cases there cited.

9. United States v. Wells, 1931, 283 U.S. 102, 118, 51 S.Ct. 446, 452, 75 L.Ed. 867, 876.

10. See, for example, the 225 pages in 3 Mertens, Estate and Gift Taxation, § 22.-01–22.85, pages 40–265; Barry, "The Taxation of Transfers in Contemplation of Death," 10 Hasting Law Journal 370 (1959); Van Allen, "Gifts in Contempla-

and no assortment of facts has ever been considered conclusive,[11] even an admission by the decedent that he made gifts with an intent to defeat death taxes.[12] Advanced age of the donor has not been determinative,[13] nor has the donor's poor health,[14] although these are obviously factors to be considered.

It is tempting to attempt to catalog those indicia which may indicate that a gift was in contemplation of death and to contrast them with those motives thought to be associated with life. Such a listing, accompanied by elaborate citation of decided cases, might give a superficial air of certainty or indeed of inevitability to this decision. But the sands of evidence are of such uncertain relative weight that the balance of justice cannot measure them sufficiently objectively to decide whether merely by such a measure gifts, deemed by the statute to have been made in contemplation of death, have been proved by the plaintiffs under all the circumstances not to have been prompted by the thought of death.

The United States Supreme Court told us 35 years ago that, "It is apparent that there can be no precise delimitation of the transactions embraced within the conception of transfers 'in contemplation of death,' as there can be none in relation to fraud, undue influence, due process of law, or other familiar legal concepts which are applicable to many varying circumstances. There is no escape from the necessity of carefully scrutinizing the circumstances of each case to detect the dominant motive of the donor in the light of his bodily and mental condition, and thus to give effect to the manifest purpose of the statute." [15] All the decisions and the texts since then add little to this analysis.

It is evident that the determination whether a gift was made in contemplation of death requires detailed factual analysis, but the conclusion may not be wholly intellectual. Decision may result also from intuition, emotional reaction, and visceral response to the composite picture that results from the images imposed on each other in court.

---

tion of Death," 95 Trusts and Estates 121 (1956); Atlas, "How to Meet the Problem of Contemplation of Death," 2 Lasser's Estate Tax Techniques 1165; Studebaker v. United States, N.D. Ind., 1961, 195 F.Supp. 841; Des Portes v. United States, E.D. S.C., 1959, 171 F. Supp. 598; Estate of Johnson, 1948, 10 T.C. 680; Atlas, "Gifts in Contemplation of Death," 23 Taxes 421 (1945).

Lowndes & Rutledge in "An Objective Test of Transfers in Contemplation of Death," 24 Tex.L.Rev. 134 (1945), urge that all subjective considerations be discarded and that the criterion be an objective test: the gift should be treated as one in contemplation of death if a reasonable man, under the circumstances, would have been conscious of death and would have made the gift in contemplation of death, regardless of the actual subjective motives of the decedent. The authors state, "The present subjective test of transfers in contemplation of death works abominably, or to be precise, it does not work at all."

11. United States v. Wells, 1931, 283 U.S. 102, 51 S.Ct. 446, 75 L.Ed. 867; Estate of A. C. Lineberger, 1954, ¶ 54,091 P–H Memo TC; Estate of Benjamin Paschal O'Neal, 1947, ¶ 47,167 P–H Memo TC,

aff'd on another point, 5 Cir., 1948, 170 F.2d 217.

12. See Campbell's Estate v. Kavanagh, E. D.Mich., 1953, 114 F.Supp. 780, in which the court refused to consider binding on the estate a statement on a gift tax return that the motive of the gift was "to avoid future inheritance taxes." See also the additional cases cited in 3 Mertens, Law of Federal Estate and Gift Taxation, § 22.07, note 53.

13. United States v. Wells, 1931, 283 U.S. 102, 51 S.Ct. 446, 75 L.Ed. 867; Burns v. Commissioner of Internal Revenue, 5 Cir., 1949, 177 F.2d 739; Betty Douglas Wilson, 1955, ¶ 55,088 P–H Memo TC; Estate of Charles J. Rosebault, 1949, 12 T.C. 1; Estate of Oliver Johnson, 1948, 10 T.C. 680.

14. Speights v. United States, D.C. N.J., 1962, 214 F.Supp. 24; Hoover v. United States, Ct. of Claims, 1960, 180 F.Supp. 601; Des Portes v. United States, E.D. S.C., 1959, 171 F.Supp. 598.

15. United States v. Wells, supra note 5, 283 U.S. at 119, 51 S.Ct. at 452, 75 L. Ed. at 876. The determination is a "question of fact in each case." Allen v. Trust Company of Georgia, 1946, 326 U.S. 630, 66 S.Ct. 389, 90 L.Ed. 367.

by advocates with opposite motives, one bent on proving that the deceased, whatever his age or health, was convinced of his immortality and impervious to thoughts of death, and the other seeking to show that the donor was weak of body and sick of mind, preoccupied by the converging approach of the grim reaper and the estate tax collector. Regardless of advocacy, however, we know that by the mandate of the statute [16] amplified by the regulations,[17] the burden of proof is imposed on the taxpayer. This means that the taxpayer has the ultimate task of persuading the Court that the gifts were not in fact made in contemplation of death,[18] although it is not necessary for him to show affirmatively that they were made for motives associated with continued life.[19]

Mindful that "this portrait" as sought to be painted in the record by counsel for the petitioner may have "more resemblance to a synthesis of decedents whose transfers have been held in many reported cases to have been made not in contemplation of death than to the real" decedents,[20] just as the picture sought to be drawn by counsel for the collector may seek to outline the image of taxpayers who have been found by other courts to have acted in contemplation of death, I turn to the facts as presented in court. Anthony A. Fatter and Pauline J. Marchand Fatter made gifts of community property to their two sons in cash on April 28, 1958, in the amount of $47,000 and on February 3, 1959, in the amount of $75,000. The gifts to Dr. Esmond A. Fatter in 1958 amounted to $23,000 and the gifts to Dr. Mervin E. Fatter in that year amounted to $24,000. The gifts in 1959 were equal. Mervin was given $1,000 extra in 1958 because he had one more child than his brother.

At the time the first gifts were made, Anthony A. Fatter was 80 years old. His wife was 69. Pauline died on April 15, 1959, 11½ months after the first gift was made. Anthony died on July 19, 1959, 14½ months after the date of that gift.

With the savings accumulated from his grocery business, Mr. Fatter had purchased several parcels of rent property. For a number of years before his death, his sole occupation had been management of these properties. Until a few years before his death, he was an active man who took a keen interest in business affairs. The plaintiffs sought to show that he did much of the maintenance work on the properties with his own hands, but I am convinced by the evidence that in the period during which these gifts were made he was in failing health, appeared to be pale and anemic, and limited his efforts to such minor exertions as helping a painter mix paint or lifting a board. Some time before his death, he stopped going to the movies. He looked ill and he suffered from poor appetite. Mrs. Fatter used her culinary skill to cook special dishes to try to get him to eat. He climbed on the roof of one of the rent properties some time before his death, but the date when he did this is uncertain.

Until shortly before his death, he could touch the floor with his palms without bending his knees. He was fond of challenging younger people to equal his agil-

---

16. Section 2035(b), Internal Revenue Code of 1954, 26 U.S.C.A. 2035(b). In addition, of course "[a] determination of tax liability made by the Commissioner is presumptively correct; the burden is on the taxpayer to prove it erroneous." Cefalu v. C. I. R., 5 Cir., 1960, 276 F.2d 122.

17. Regulations, Section 20.2035–1(b). See Ness, "The Role of Statutory Presumptions in Determining Federal Tax Liability," 1957, 12 Tax Law Review 321, 393, 401.

18. Id. at page 412. See also Butterworth v. Usry, E.D. La., 1959, 177 F.Supp. 197; Belyea's Estate v. Commissioner of Internal Revenue, 1953, 3 Cir., 206 F.2d 262.

19. Dierks v. United States, D.C. Kan., 1949, 86 F.Supp. 832.

20. Estate of Oliver Johnson, 1948, 10 T.C. 680, 691.

ity in this regard. He was said to be optimistic by nature but inclined to be businesslike and conservative in his actions. He was described by a physician as aggressive in nature. As a result entirely of his own efforts, he had achieved a measure of financial success and he liked to talk about his accomplishments, sometimes to such length that acquaintances avoided him. He was said by one of his sons to have been a firm parent, and he dominated his family circle.

Mr. Fatter suffered from arteriosclerosis for a number of years. He was treated at Mercy Memorial Hospital in August, 1954 for a heart condition. On December 1, 1954, he was again admitted to the hospital for treatment of an indolent ulcer; the diagnosis indicated he had arteriosclerotic heart disease, arthritis, and varicose veins. He had a heart attack in November, 1954, and digitalis was prescribed for him. From that time, his doctor testified, his condition was serious and in a statement given at the time of Mr. Fatter's death, the doctor said that Mr. Fatter "lived a very sedentary life" thereafter. In January, 1955, he suffered a fainting spell and was treated in the hospital for 12 days. He was suffering primarily from his heart condition. He was again treated at the hospital in an effort to manage his heart condition in February, 1955. He visited a heart specialist several times in 1955. In May, 1956, he consulted the heart specialist because he had fainted twice that day. On the day his wife died he fell and hurt himself. He suffered a brain contusion, and his death was at least partially attributable to his fall.

Mrs. Fatter was a cheerful pleasant person who liked to wear bright clothes. Her family had been long lived. She enjoyed card playing. She was a good cook who did her own cooking and housekeeping. She was anxious about her husband's physical condition and tried to take care of him. At her insistence he stopped driving his own car some time before he died, and she chauffered him until the time of her death. She drove her automobile until a day or two before her death.

Mrs. Fatter had an operation for a lowgrade malignancy in 1956. The attending physician did not consider it serious. In July 1958, she suffered a heart attack, and the diagnosis was angina pectoris, myocardial ischemia, and complete heart block. She was in the hospital for 8 days. At the time she was also suffering from arteriosclerosis. Her heart attack was serious but the attending physician thinks that he probably told her only that she had a heart condition and had to take care of herself because he usually did not advise such patients of the gravity of their condition. She was again treated in the hospital for 6 days beginning September 20, 1958, for hypertension and complete heart block.

In the period from October 24, 1955, to the time of their first gifts to their sons, the Fatters sold seven parcels of rental property, receiving $107,575 in cash plus mortgage notes amounting to $6,000. Their retained assets had a total value of $228,000.

After selling the property on which they had previously lived, the Fatters purchased a single residence for themselves on September 7, 1956, paying $3,000 cash and giving a mortgage for $22,000. At this time they apparently had sufficient cash on hand to pay for the property.

The decedents had discussed making the gifts two or three years before actually making them. One of the reasons for the delay was reluctance to pay the gift tax, a motive normally associated with life.[21]

Both Fatter children were practising physicians earning a comfortable living at the time of the gifts to them. The funds they received were deposited in savings accounts. They had no particu-

---

21. United States v. Wells, supra note 5; Hoover v. United States, Ct.Cl., 1960, 180 F.Supp. 601; Anna B. Kneeland, 1936, 34 B.T.A. 816.

lar need for the funds and the gifts did not apparently alter their manner of living. Their parents had never previously made any substantial gifts to them; the only prior donation mentioned at the trial was of enough cash to enable one son who was then building his home to finish the bath in tile instead of some other material. Mr. Fatter had observed that he had struggled for what he got and he wanted his boys to struggle too.

The lawyer who advised the Fatters to make the gifts testified that he recommended that the gifts be made to save death taxes. He is also now deceased, but in a deposition taken by the plaintiffs he stated that the Fatters regarded these gifts as "sufficient inheritance." Although there was testimony by Dr. Mervin Fatter, who lived in Texas, that his parents wanted to see their children use and invest the money wisely, the testimony of Dr. Esmond Fatter, who lived in New Orleans and talked to his parents about the gifts a number of times, was principally about why his parents did not make the gifts earlier.

The record as a whole is convincing that the gifts were made as an advance on the plaintiffs' inheritance and that saving death taxes was one of the motives for them. The decedents' sale of virtually all their real estate holdings after many years of attention to them indicates a pattern of liquidation of investments, and the fact that the subsequent gifts were made in cash negates the idea that the decedents wanted their sons to continue their own lifetime investments.

The decedents had not previously demonstrated family generosity, and it is difficult to find any motive but contemplation of death in these gifts of substantial size, made on the advice of counsel, by donors in poor health, only a short time before their respective deaths. The gifts being deemed by the statute to have been made in contemplation of death, and the plaintiffs not having shown to the contrary, judgment will be entered by the Clerk in favor of the defendant.