**FIRST NATIONAL BANK AT LUB-BOCK, Trustee, Plaintiff-Appellee,**

v.

**UNITED STATES of America, Defendant-Appellant.**

No. 71–1732.

United States Court of Appeals, Fifth Circuit.

July 12, 1972.

Rehearing Denied Aug. 31, 1972.

Eldon B. Mahon, U. S. Atty., Fort Worth, Tex., William W. Guild, Atty., Tax. Div., Dept. of Justice, Dallas, Tex., Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Gilbert E. Andrews, Harry Baum, Donald H. Olson, Attys., Dept. of Justice, Tax Div., Washington, D. C., Johnnie M. Walters, Asst. Atty. Gen., for defendant-appellant.

Roy Bass, Kennett Hobbs, Bass & Hobbs, Lubbock, Tex., for plaintiff-appellee.

Before AINSWORTH, INGRAHAM and RONEY, Circuit Judges.

INGRAHAM, Circuit Judge:

This action was brought by taxpayer as executor of the estate of Vera Harrell for a refund of estate taxes paid. The Commissioner of Internal Revenue determined that four gifts of property made by decedent to her daughter within four months of death had been made "in contemplation of death" under § 2035 of the Internal Revenue Code,[1] and assessed a deficiency. Taxpayer's timely claim for refund having been disallowed, suit was instituted in the court below. The case was tried to a jury, which answered special interrogatories in favor of taxpayer, and the district court entered judgment on the jury's verdict.[2]

At the close of taxpayer's case and then at the end of all the evidence, the government moved for a directed verdict. Upon the entry of judgment, the government moved for judgment notwithstanding the verdict or, alternatively, for a new trial. These motions were denied and the government appeals from the judgment and order overruling its motion for judgment notwithstanding the verdict. We reverse.

The facts as brought out below indicate that on November 8, 1963, Mrs. Vera Harrell visited the office of her attorney to discuss the preparation of a will. Her attorney prepared a list of property that Mrs. Harrell owned, and an estimate of the value of the listed property. Her total assets were deemed to be $468,750, and the attorney roughly calculated that the federal estate and state inheritance taxes on an estate of this size would be $128,500. Mrs. Harrell expressed shock at the size of her estate and the attorney explained to her

1. 26 U.S.C.A. § 2035.

2. Specifically, the jury's answers as to each of the four gifts was that they were not made in contemplation of death.

that she could reduce the estate's tax liability by making gifts of some of her property.

At the time of the visit to her attorney's office, Mrs. Harrell was a sixty-one year old widow, who had been a school teacher for over thirty years. She lived with her daughter, an only child, Lamoyane, who was unmarried, thirty-three years old, and also a teacher. After this visit Mrs. Harrell, in December 1963, made the first gift in question to Lamoyane—four church bonds of the value of $2000. On January 6, 1964, an account in a savings and loan association, containing $6,081.84, which had previously been jointly owned, was placed solely in Lamoyane's name. The third gift in question was the placing on January 27, 1964, of a $2,375.63 account in the Lubbock Teacher's Federal Credit Union solely in Lamoyane's name.

In early February 1964 Mrs. Harrell seems to be suffering from a skin disorder, and on February 7 she visited Dr. R. C. Douglas, a specialist in internal medicine located in Lubbock, Texas. No specific findings were made, but the doctor found an abnormal blood count. On February 10 a further examination was conducted and hospital tests were ordered in order to investigate a blood disorder. Mrs. Harrell was admitted to the hospital on February 11, 1964, for tests, including a bone marrow study, and Dr. Douglas wrote in Mrs. Harrell's physical examination history that his tentative diagnosis was "Undiagnosed hematological disease. Suspect aleukemic leukemia."[3] It was on that same day of admission to the hospital that Mrs. Harrell made the fourth gift to her daughter—8000 shares of Combined Insurance Company stock with a value of $85,000.

On February 19, 1964, Mrs. Harrell's will was executed, which provided that the home, automobile and household goods be left to the daughter, and that the residue of the estate be placed in trust with the income to the daughter for life.

On February 20, 1964, Mrs. Harrell's condition was improved and she was discharged. Dr. Douglas' report of this date suggested a suspected condition of aplastic anemia, but leukemia was not ruled out. Only forty-eight hours later Mrs. Harrell was readmitted to the hospital with high fever. Dr. Douglas sought the advice of certain Dallas doctors and Mrs. Harrell was transferred to a Dallas hospital in March.

Dr. Douglas testified that he never specifically told Mrs. Harrell that she had a fatal disease or leukemia, but he did tell her that he had been looking for a serious disease and thus had ordered three bone marrow studies. He informed her of this at some time before the transfer to Dallas. Leukemia was firmly diagnosed in March, and Mrs. Harrell passed away on April 1, 1964.

Section 2035(a) of the Code provides in pertinent part that:

"The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer . . . in contemplation of his death."

In addition, there is a statutory presumption provided by § 2035(b):

"If the decedent within a period of 3 years ending with the date of his death . . . transferred an interest in property . . . such transfer . . . shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section . . . ."

The Treasury Regulations attempt to clarify the meaning of the words "in contemplation of death" as follows:

"The phrase 'in contemplation of death', as used in this section, does not have reference to that general expectation of death such as all persons

3. This report was dated February 12, 1964.

entertain. On the other hand, its meaning is not restricted to an apprehension that death is imminent or near. A transfer 'in contemplation of death' is a disposition of property prompted by the thought of death (although it need not be solely so prompted). A transfer is prompted by the thought of death if (1) made with the purpose of avoiding death taxes, (2) made as a substitute for a testamentary disposition of the property, or (3) made for any other motive associated with death. The bodily and mental condition of the decedent and all other attendant facts and circumstances are to be scrutinized in order to determine whether or not such thought prompted the disposition."

This court in Bel v. United States, 452 F.2d 683 (5th Cir., 1971), recently explicated the general legal principles associated with § 2035:

"The underlying purpose of section 2035 is to prevent evasion of the federal estate tax by excising those transfers of a decedent which are essentially substitutes for testamentary dispositions. United States v. Wells, 1931, 283 U.S. 102, 116–117, 51 S.Ct. 446, 75 L.Ed. 867. Accordingly, the presumption embodied in section 2035(b) is rebuttable, for if a taxpayer can demonstrate that a donation made within the three-year period was not a substitute for a testamentary disposition, then the dominant purpose of section 2035 is not served by taxing such a transfer. Therefore, in every instance in which a transfer is effectuated within the statutory period, the crucial inquiry is whether or not the donation represents a testamentary substitute, or in statutory terminology, whether or not the transfer was made 'in contemplation of death.'

"The phrase 'in contemplation of death' does not encompass the general expectation of death which all mortals entertain. Rather, the Supreme Court has held that a transfer is made in contemplation of death only if the thought of death is the impelling cause of the transfer. Allen v. Trust Co. of Georgia, 1946, 326 U.S. 630, 635, 66 S.Ct. 389, 90 L.Ed. 367. Of course, the statutory presumption casts upon the taxpayer the burden of proof as to the dominant, controlling, and impelling motive of the decedent in making a transfer. This means that the taxpayer has the task of persuading a court that in transferring property the decedent was not motivated by purposes associated with the distribution of property in anticipation of death. Fatter v. Usry, E.D. La.1967, 269 F.Supp. 582. And, of course, whether or not any particular purpose was 'the dominant, controlling or impelling motive is a question of fact in each case.' Allen v. Trust Co. of Georgia, *supra*, 326 U.S. at 636, 66 S.Ct. at 392."

452 F.2d at 687.

It is thus clear that taxpayer had the burden of going forward with affirmative evidence to establish a dominant life motive for the gifts. See Landorf v. United States, 408 F.2d 461, 472, 187 Ct.Cl. 99 (1969).[4] Taxpayer did introduce evidence of strong bonds of love and affection between decedent and her daughter, and there was testimony in the record that Mrs. Harrell was cheerful and optimistic about her health. Love and affection, however, are not sufficient under the circumstances here presented. Even were we to assume that Mrs. Harrell was unaware of the gravity of her illness, the record indicates overwhelming evidence of a desire and plan to get the property out of the

---

4. The court in *Landorf* goes on to say: "Generally, both life and death motives are involved in these transfers and the inquiry, therefore, becomes whether the 'life' motives were the 'dominant controlling or impelling' reasons for the transfer." 408 F.2d at 472.

estate to lessen the estate tax burden.[5] "While the only certainties in life might be death and taxes, the tax reaper cuts his swath within section 2035 when the conjunction of these certitudes has a contrived rather than an aleatory positivism." Bel v. United States, *supra*, 452 F.2d at 688.

The determinative question is whether the evidence formed a sufficient basis to justify the district court's submitting this case to the jury. The applicable standard has been set forth in this court's en banc decision in Boeing Company v. Shipman, 411 F.2d 365, 374–375 (5th Cir., 1969):

"On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case —but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one

5. The following testimony from cross-examination of Mrs. Harrell's attorney is instructive:

"Q. Did you tell her or did you not tell her that she could avoid or minimize the estate tax by making gifts?

A. I told her that whatever she didn't own when she died normally would not be taxed. That's the language I generally use in talking to my clients along that line. . . .

Q. Now, Mr. Bass, I'm going to recall for you the time that I had the conversation with you in your office. Didn't you inform me that you informed Mrs. Harrell that she could minimize her estate taxes, reduce the value of her estate by making gifts, and that Mrs. Harrell, pursuant to that advice, implemented this by making gifts to her daughter?

A. I know she made gifts after our conference.

Q. But that she made them pursuant to your advice?

A. I don't know about that.

Q. All right. Did Mrs. Harrell call you from time to time and tell you what gifts she made, and did you record them on this document?

A. On Defendant's Exhibit 1 here. I have marked Lamoyane's name by some of these assets here, showing that I had later learned that these gifts were made, but when I got that knowledge I really don't know.

Q. Do you recall telling me, Mr. Bass, that Mrs. Harrell, that is, the decedent, from time to time would call you and you would record it on this sheet to show that that eliminated part of her estate?

A. I don't recall that exact language, Mr. Guild. It may be that it was.

Q. In essence, isn't that what you told me?

A. I just don't remember.

Q. You don't remember?

A. I do know that I learned that she had made these gifts, but I don't remember how or when.

Q. All right. Let's take a look at Exhibit No. 1.

A. Yes, sir.

Q. There shows the State Savings & Loan, and it's written in darker pen. Do you see that, sir?

A. Yes, sir.

Q. And then in a lighter pen it says 'Lamoyane', is that correct?

A. Correct.

Q. You have got 'five thousand' crossed off?

A. Yes, sir.

Q. What does that State Savings & Loan actually refer to?

A. Either she gave me the wrong association or I misunderstood her, because I don't think she ever had one in State Savings & Loan. I think this has reference to the First Federal Savings & Loan account that is in dispute here in the lawsuit.

Q. That's right, about six thousand some odd dollars, right?

A. Yes, sir.

Q. That refers to one of the gifts?

A. Correct.

Q. Now, underneath the twelve thousand shares of Combined American Insurance stock, I see two thousand shares given to Lamoyane, 2/20/64?

A. Yes, sir.

Q. You put that in there afterward, isn't that correct?

A. That was the date that the transfer agent of the stock in Chicago acknowledged the receipt of the shares, I believe, yes sir.

Q. So that was in November you wrote that down, and sometime, apparently on the 20th, or thereafter, you put down that this two thousand shares had been given to Lamoyane?

A. I believe that's correct."

party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. *There must be a conflict in substantial evidence to create a jury question.* However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses." (Emphasis added)

The testimony offered by taxpayer in the instant case was not sufficient to create a substantial conflict on the question of motivation, and thus the district court erred in submitting this case to the jury.[6] We make clear, however, that in so holding we are not enabling the government to rely on § 2035(b) as a virtually irrebuttable presumption. We only hold that under the particular circumstances here presented, taxpayer was unable to present specific evidence of life motive. For example, there was no indication that Lamoyane had any particular need or desire for which the money could be used, such as hobbies, travels, a new home, etc. No records were kept to establish that Mrs. Harrell's purpose was to avoid income taxes, or that some other life motive was an impelling cause for the four gifts in question.

Accordingly, the judgment of the district court is reversed and the case is remanded with directions that a judgment notwithstanding the verdict be entered in favor of the United States.

Reversed and remanded with directions.

---

6. See the dissenting opinion in United States v. Generes, 427 F.2d 279, 284–285 (5th Cir., 1970), and the Court's reversal, United States v. Generes, 405 U.S. 93, 104–107, 92 S.Ct. 827, 31 L.Ed. 2d 62 (1972).