Joe P. CUNNINGHAM, J. B. Cunningham and W. H. Swain, Independent Executors of the Estate of Harry T. Parker, Deceased, Plaintiffs-Appellees,

v.

UNITED STATES of America, Defendant-Appellant.

No. 75–2574.

United States Court of Appeals, Fifth Circuit.

June 2, 1977.

Frank D. McCown, U. S. Atty., William L. Johnson, Jr., Asst. U. S. Atty., Fort Worth, Tex., Scott P. Crampton, Asst. Atty. Gen., Leonard J. Henzke, Jr., John G. Manning, Tax Div., U. S. Dept. of Justice, Washington, D. C., Gilbert E. Andrews, Acting Chief, Appellate Sec., Dept. of Justice, Washington, D. C., for defendant-appellant.

Lee Sellers, Wichita Falls, Tex., for plaintiffs-appellees.

Before GODBOLD, TJOFLAT and HILL, Circuit Judges.

TJOFLAT, Circuit Judge:

Upon the filing of a tax return for the estate of Harry Parker, the Internal Revenue Service (IRS) asserted a deficiency, claiming that some $276,000 in gifts had

been distributed by Mr. Parker in contemplation of death. The alleged deficiency was paid, and the filing for a refund being unfruitful, the estate brought suit in district court. A jury determined that Mr. Parker had not made the gifts in contemplation of death, but rather had acted with life motives. IRS now appeals, contending that the trial judge erred in not directing a verdict in its favor or granting it a new trial or judgment notwithstanding the verdict.

## I

■■ The controlling law is not debated by the parties and is clearly set out in our prior decisions. Under 26 U.S.C. § 2035 (1970) as in effect at the time of Parker's death,[1] a gift made within three years of the donor's death is presumed to be made in contemplation of death and thus includable in the value of the estate. This presumption can be overcome, however, if the estate can show that the gifts were not substitutes for testamentary dispositions. The taxpayer has the burden of going forward with affirmative evidence to establish a dominant life motive for the gifts. *See generally Allen v. Trust Co.,* 326 U.S. 630, 66 S.Ct. 389, 90 L.Ed. 367 (1946); *Berman v. United States,* 487 F.2d 70 (5th Cir. 1973); *First National Bank v. United States,* 463 F.2d 716 (5th Cir. 1972), *cert. denied,* 409 U.S.

1125, 93 S.Ct. 939, 35 L.Ed.2d 257 (1973); *Bintliff v. United States,* 462 F.2d 403 (5th Cir. 1972); *Bel v. United States,* 452 F.2d 683 (5th Cir. 1971), *cert. denied,* 406 U.S. 919, 92 S.Ct. 1770, 32 L.Ed.2d 118 (1972).[2]

Likewise, the appropriate legal standard for review of a denial of a directed verdict or judgment notwithstanding the verdict is not in dispute. The words of *Boeing Co. v. Shipman,* 411 F.2d 365, 374–75 (5th Cir. 1969) (en banc), have often been quoted:

On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. . . . A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and de-

1. At Parker's death in 1970, section 2035 provided,

(a) The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, in contemplation of his death.

(b) If the decedent within a period of 3 years ending with the date of his death (except in a case of a bona fide sale for an adequate and full consideration in money or money's worth) transferred an interest in property, relinquished a power, or exercised or released a general power of appointment, such transfer, relinquishment, exercise, or release shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section and sections 2038 and 2041 (relating to revocable transfers and powers of appointment);

but no such transfer, relinquishment, exercise, or release made before such 3-year period shall be treated as having been made in contemplation of death.

The section has since been amended, but that is of no relevance to this case since the amended section applies only to gifts made after December 31, 1976. *See* Tax Reform Act of 1976, Pub.L. No. 94–455, § 2001(a)(5), 90 Stat. 1848 (1976).

2. "The phrase 'in contemplation of death' does not encompass the general expectation of death which all mortals entertain." *Bel v. United States,* 452 F.2d 683, 687 (5th Cir. 1971), *cert. denied,* 406 U.S. 919, 92 S.Ct. 1770, 32 L.Ed.2d 118 (1972). On the other hand, "[i]t is not enough for the estate to show that decedent was in good health and did not anticipate immediate death." *Berman v. United States,* 487 F.2d 70, 73 (5th Cir. 1973). *See also United States v. Wells,* 283 U.S. 102, 51 S.Ct. 446, 75 L.Ed. 867 (1931); 26 C.F.R. § 20.2035(c) (1976).

termine the credibility of witnesses. (Footnote omitted.)

Our task, therefore, is to ascertain whether there was substantial evidence introduced at trial to support a finding that the gifts in question were impelled by life motives rather than bestowed in contemplation of death. In this connection, we note that several factors have figured prominently in similar cases in the past. Those factors include, *inter alia,* (a) the age of the decedent at the time the transfers were made; (b) the decedent's health, as he knew it, at or before the time of the transfers; (c) the interval between the transfers and the decedent's death; (d) the amount of the property transferred in proportion to the amount of property retained; (e) the nature and disposition of the decedent; (f) the existence of a general testamentary scheme of which the transfers were a part; (g) whether the donees to the decedent were the natural objects of his bounty; (h) the existence of a long established gift-making policy on the part of decedent; (i) the existence of a desire on the part of the decedent to escape the burden of managing property by transferring the property to others; (j) the existence of a desire on the part of the decedent to experience vicariously the enjoyment of the donees of the property transferred; and (k) the existence of the desire by the decedent of avoiding estate taxes by means of making inter vivos transfers of property. *Estate of Johnson,* 10 T.C. 680, 688 (1948). *See generally* 4 J. Rabkin & M. Johnson, Federal Income, Gift and Estate Taxation § 52.03 (1976). Of course, "the dominant, controlling or impelling motive is a question of fact in each case." *Allen,* 326 U.S. at 636, 66 S.Ct. at 392. With these principles in mind, we turn to the evidence presented in this case.

## II

■ *Age and Health.* Substantial evidence was presented at trial for the jury to believe that the decedent was not anticipating death shortly when he made the gifts in question. In fact, it was over two years later when he did succumb suddenly to a heart attack at the age of seventy-seven. Although in April 1965 he had had cancerous polyps removed from his colon, his doctor testified that he had fully recovered from that condition and had been very active. Several other witnesses told of his many interests and hobbies and generally optimistic view of life.

Although relevant to the motivation of the donor, proving that he did not anticipate immediate death is not in and of itself enough to carry the burden required of the estate. *Berman,* 487 F.2d at 73. Consequently, we must examine other factors.

*Size of the Gifts.* The decedent was a single man of considerable means, having an estate of about two million dollars at the time of making his challenged 1968 gifts. This means that the gifts were only about 15% of his total worth. Moreover, the evidence showed that the gifts were made from a non-interest bearing checking account. A savings account of over one million dollars which produced a comfortable yearly income was not affected.[3] The size of the gifts, therefore, cannot be equated with a testamentary disposition. To the contrary, "the very fact that the decedent chose to make the gifts at a time and in a fashion that would not result in any reduction in [his] current income strongly suggests [he] was contemplating continued life." *Hunt v. United States,* 71–1 U.S.Tax Cas. ¶ 12,784 (C.D.Cal.1971).

*Pattern of Giving.* During the thirty-year period preceding his death, Parker had made ninety-five gifts totalling well over one million dollars. In 1968 he gave three of his nephews and their families a total of $100,000 each.[4] Identical amounts had been

---

**3.** The evidence demonstrated the existence of other sources of income as well, such as royalties from oil production. It also showed that the decedent's life style was far from extravagant.

**4.** The amounts were distributed by giving $3,000 each to the wife and children and the remainder of the $100,000 to the nephew.

given in 1966 and 1967. This tends to demonstrate a pattern of benevolence not engendered by the thought of death.

The IRS argues that this pattern of giving in the years 1966 through 1968 was all in contemplation of death, although the conclusive presumption in section 2035(b) prevented inclusion in the estate of the 1966 and 1967 gifts. The suggestion is plausible because the gifts were large in amount and began about a year after the decedent's cancer surgery. The suggestion was undermined at trial, however, by the fact that Parker had made similarly large gifts in the past and that he was told by his physician in 1966 that he had fully recovered from the surgery. Despite confirmation of the doctor's prognosis in subsequent years, Parker continued his pattern of giving.

*Relationship of Donees to Decedent.* Mr. Parker was a bachelor all his life. The gifts in question were made to three of his nephews and their families. The nephews were all the sons of his sister who had died eleven days after her son Henry Swain was born. Swain's twin half-brothers, J. B. and Joe Cunningham, had lost their father in a railroad accident thirteen days before they had been born. When Parker's sister died, the three boys were orphaned. Swain spent his next ten years being reared by Parker and his mother on the family ranch. His two half-brothers went to live with other family members. There was testimony to the effect that Parker, although taciturn about his affairs, had shown special solicitude to these three nephews. In short, the jury had ample evidence before it to decide that these donees were natural objects of the decedent's bounty.

*Synthesis.* Our review of the evidence convinces us that, although inferences could be drawn to support either side of the central issue in the case, substantial evidence existed upon which the jury could conclude that the gifts were not made in contemplation of death. We have noted before that the estate's burden is a difficult one because a negative must be proven. *Berman,* 487 F.2d at 72. This does not mean, however, that section 2035(b)'s presumption

is irrebuttable. *First National Bank,* 463 F.2d at 721. "It is entirely normal for an individual to make gifts during his lifetime to the natural objects of his affection and bounty." J. Rabkin & M. Johnson, *supra,* at § 52.03(7). It was well within the jury's province in this case to conclude that life motives were the "dominant, controlling or impelling" cause of the Parker gifts. *Allen.*

We do not find the cases relied upon by IRS to be persuasive. In *Berman v. United States,* 487 F.2d 70 (5th Cir. 1973), the decedent bought a $30,000 flight insurance policy on his life only minutes before he was killed in a plane crash. In a bench trial, the trial judge held that the contemporaneous assignment of the policy to the decedent's son was not in contemplation of death. The appellate panel was compelled to reverse because the district court had applied an improper test. The panel elucidated that the "question is not whether he expected to die, but whether the assignment of the policy was motivated by the thought that he might die." *Id.* at 72. Needless to say, when the property transferred is so inherently death-oriented as life insurance, the estate's burden is exceedingly heavy to prove life motives. *Id.* In *Bintliff v. United States,* 462 F.2d 403 (5th Cir. 1972), life insurance policies were again the center of controversy. And in *First National Bank v. United States,* 463 F.2d 716 (5th Cir. 1972), *cert. denied,* 409 U.S. 1125, 93 S.Ct. 939, 35 L.Ed.2d 257 (1973), there was "overwhelming evidence of a desire and plan to get the property out of the estate to lessen the estate tax burden." *Id.* at 719–20 (footnote omitted). In the case now before us, the gifts were not inherently death-oriented and the evidence of a motive integrally connected with the certitude of death was not so overwhelming as to require us to set the jury verdict aside.

We find more instructive here the case of *Estate of Johnson,* 10 T.C. 680 (1948). In that case, gifts by a nonagenerian of a large part of his estate were held to be life motivated. Relying in large part on the good health and optimistic outlook of the donor and his desire to relinquish the man-

agement of certain properties without becoming dependent on his children, the Tax Court determined that the impetus for the gifts was not the thought of death.

On the facts of this case, we think it clear that there was substantial evidence presented for the jury to conclude that Mr. Parker's gifts in 1968 were not motivated by the thought of death, but rather by a healthy, life-oriented benevolence. Accordingly, the trial judge did not err in refusing to direct a verdict, grant judgment n. o. v., or award a new trial. The judgment appealed from is

AFFIRMED.