ESTATE OF MARY BARATTA-LORTON, DECEASED, ROBERT BARATTA-LORTON, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Baratta-Lorton v. Commissioner
Docket No. 16711-82.
United States Tax Court
T.C. Memo 1985-72; 1985 Tax Ct. Memo LEXIS 558; 49 T.C.M. (CCH) 770; T.C.M. (RIA) 85072; February 20, 1985. *558 Petitioner did not include in the gross estate the proceeds of a term life insurance policy on the decedent's life, which was acquired within 3 years of the decedent's death. The owner and beneficiary of the policy was the decedent's husband. Payment of the policy premiums was made by the decedent's employer. The decedent and her husband orally agreed that the policy was to be the husband's separate property. Held: The decedent did not possess any "incident of ownership" at death and therefore no part of the proceeds are taxable under section 2042, I.R.C., 1954. Held further: Payment of the premium by the decedent's employer represented compensation to the decedent; and because under California law, one spouse has a community interest in the earnings of the other, the decedent is deemed to have paid one-half of the premium and to have transferred, within the purview of section 2035, I.R.C., 1954, one-half of the right to the proceeds to her husband within 3 years of her death; Held further: Since the decedent's entire estate consisted of community property, and the value of that property, net of the deductions allowed under section 2053, I.R.C., 1954, for claims and expenses of *559 administration, exceeded $250,000, no amount is allowable to the decedent's estate as a marital deduction under section 2056, I.R.C., 1954. Raymond N. Bolton, for the petitioner. Eugene H. Ciranni and Claire Priestly-Cady, for the respondent. JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION
JACOBS, Judge: Respondent determined a deficiency of $45,520 in Federal estate tax against the Estate of Mary Baratta-Lorton, deceased. After concession by petitioner, the issues for decision are as follows: (1) Did the decedent possess a community property interest in a term life insurance policy on her life (of which her husband was the owner and beneficiary), which, if answered in the affirmative, would result in the inclusion of one half of the proceeds of such policy in the gross estate under section 2042[1]? (2) Whether the issuance within one year of the decedent's death of a term life insurance policy on her life (of which her husband was the owner and beneficiary and the premiums paid by her employer) constituted a taxable transfer under section 2035? (3) Whether the decedent's estate is entitled to a marital deduction under section 2056, where the entire estate is comprised of community *560 property which passed to her surviving spouse? FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation is incorporated herein by this reference. The petitioner is the Estate of Mary Baratta-Lorton, deceased. Mary Baratta-Lorton (hereinafter "the decedent"), died on August 28, 1978, in San Francisco, California. No executor or administrator was appointed for her estate. The decedent's husband, Robert Baratta-Lorton (hereinafter "Robert"), is in actual possession of her property, and therefore he is the "executor" of her estate within the meaning of section 2203. At the time of the filing of the petition, Robert resided in Saratoga, California. The Federal estate tax return filed for the estate reported five insurance policies on the decedent's life. The issuing insurance company, the face amount, the type of policy, and the owner and the beneficiary of each policy are as follows: NAME OF
POLICY
FACE
TYPE OF
INS. CO.
NUMBER
AMT.
POLICY
OWNER
BENEFICIARY
All American
Life &
G507-
Casualty Co.
2101197
$ 50,000
[2]
Decedent
Robert
Center
Center
for
for
Innovation
Innovation
Travelers
Convertible
In Education
In Education
Ins. Co.
4022155
$100,000
Term
Travelers
Convertible
Ins. Co.
4022156
$200,000
Term
Robert
Robert
Pacific
Mutual Life
Ins. Co.
102284
$100,000
Group Term
Robert
Robert
Life Ins.
Co. of
North Amer
OK-5304
$ 50,000
Group Term
Robert
Robert
*561 Of the insurance proceeds received, only those from the all American Life & Casualty Company policy were reported on the Federal estate tax return as includible in the decedent's gross estate. Respondent determined that the decedent owned a community property interest in Travelers Insurance Company policy #4022156 (hereinafter referred to as the "Travelers policy"), and in the policies issued by Pacific Mutual Life Insurance Company and Life Insurance Company of North America. As a result, respondent in the deficiency notice included one-half of the proceeds of those policies in the gross estate. [3] Petitioner concedes that the policies issued by Pacific Mutual Life Insurance Company and Life Insurance Company of North America were community assets, and that therefore one-half of the proceeds from such policies are includible in the gross estate; however, petitioner maintains that the Travelers policy was not community property and that consequently none of the proceeds from the Travelers *562 policy are includible in the gross estate. Robert and the decedent met in 1966 and married in 1967. Both were public school teachers at the time, and both received master's degrees from the University of California at Berkeley. In 1967 and 1968, the decedent wrote a book entitled Workjobs, which was published in 1972. In 1971, Robert and the decedent were hired as mathematics consultants and in-service instructors for a State of California teaching project called "The Miller Mathematics State Specialized Teacher Improvement Project". In 1974, Robert and the decedent formed a partnership called "Baratta-Lorton Educational Consultants." Through the partnership, Robert and the decedent engaged in the business of conducting workshops for teachers. The decedent and Robert formed the Center for Innovation in Education, Inc. (hereinafter referred to as "the Center") in 1974. The Center was created as a non-profit, non-stock California corporation, *563 and its stated purposes were: "(1) [t]o establish, own and operate educational facilities; (2) [t]o provide formal educational instruction and schooling, and (3) [t]o develop, test, use and encourage the use of innovative educational methods, materials and programs in formal education." The Center's principal place of business was the decedent's and Robert's residence. The decedent and Robert were two of the five directors of the Center. Robert was its president and treasurer, while the decedent held the offices of vice-president and secretary. Although Baratta-Lorton Educational Consultants received fees from the Center for workshops conducted by Robert and the decedent, Robert and the decedent received no salaries from the Center in their individual capacities, despite the fact that they devoted substantial amounts of time to the Center's activities. Prior to the decedent's death, Robert and the decedent authored three publications which they donated to the Center [4] *564 . The Center received all the royalties from the three books. At the time of the decedent's death, the decedent and Robert were developing a reading program and intended to donate that program to the Center. Robert's father, Paul Lorton, had been a trust officer with two different banks in California for a period of ten years, and a professional fund raiser (specializing in deferred giving) for six or seven years. Over the years, Mr. Lorton periodically discussed estate planning matters with Robert, [5] and advised both Robert and the decedent that, if they ever acquired life insurance, estate tax savings could be gained from cross-ownership of the policies. Mr. Lorton advised that any policy insuring the life of one spouse should be held as the separate property of the uninsured spouse, and that separate property status could be achieved if the premiums were paid from separate funds or, in the event that only community funds were available, if the insured spouse made a cash gift to the uninsured spouse to cover the costs of the premiums. While Mr. Lorton advised Robert and the decedent of the necessity of an agreement between them as to the separate status of any such policies, he never advised them that the agreement should be written because he believed that an oral agreement was sufficient under California *565 law. The Board of Directors of the Center adopted the following resolution by unanimous written consent executed in September, 1976: "Life Insurance for Officers: RESOLVED: To facilitate this organization[']s ability to secure working capital by establishing confidence in its ability to meet its financial commitments in the event of the death of one or more of its chief officers, the Board of Directors authorizes the President and/or the Secretary to purchase Term Life Insurance Policies for amounts not to exceed one hundred thousand dollars ($100,000.00) and terms not to exceed five years on the President and the Secretary of this organization; the Center for Innovation in Education to be named beneficiary of said policies." *566 By unanimous written consent, dated April 8, 1978, the Board of Directors adopted the following resolution: "Life Insurance: RESOLVED: That the President and secretary of this organization are authorized to secure term life insurance policies on themselves in amounts deemed necessary by the President and the Secretary of this organization to act as sufficient collateral for loans make [sic] to the CENTER FOR INNOVATION IN EDUCATION in conjunction with the financing of the as yet untitled reading project and in amounts deemed necessary by the President and the Secretary of this organization to provide sufficient funds to provide for the continued operation of the CENTER FOR INNOVATION IN EDUCATION in the event of the death of either the President or the Secretary or both." [Emphasis in original.] Prior to the April 8, 1978 amendment to the September, 1976 resolution, the decedent, on November 10, 1977, executed the application for the Travelers policy. The decedent signed the application as the "Insured"; Robert signed the application as the "Owner" and signed on behalf of the Center as the "Applicant." The premiums for the Travelers policy and for an identical policy on Robert's life *567 (for which an application had been simultaneously completed) was paid for by a check dated November 10, 1977, in the amount of $466, which was drawn on the Center's account, and which was signed by both Robert and the decedent. [6] Robert and the decedent did not report the amount of the premiums paid by the Center on the two policies as income on their Federal income tax return. The Travelers policy was issued on March 13, 1978. Robert testified that the Travelers policy was obtained so that, in the event of the decedent's death, he would have the means to complete the reading program that he and the decedent were then developing. He further testified that both he and the decedent intended to donate the completed program to the Center and that the purpose in obtaining the Travelers policy was to benefit the Center by assuring the completion of the program. Both Robert and the decedent felt, however, that there was flexibility to be gained by making Robert the *568 beneficiary, in his individual capacity, rather than the Center. There were no formal restrictions on Robert's use of the life insurance proceeds, and Robert was not obligated to apply the insurance proceeds to further the development of the reading program. OPINION Respondent has advanced alternative theories in support of his contention that one-half of the proceeds of the Travelers policy are includible in the gross estate. One of respondent's theories is that the policy was a community asset and therefore one-half the proceeds are includible under section 2033 and section 2042. Alternatively, respondent argues that one-half of the proceeds is includible under section 2035 since the policy was acquired within three years of death with community funds. As a threshold matter, we find respondent's reliance on section 2033, [7] *569 a general provision, curious given that Congress enacted a specific provision to govern the taxability of a life insurance policy on a decedent's life in which the decedent had an interest. See Singer v. Shaughnessy,198 F.2d 178 (2d Cir. 1952). The specific provision is, of course, section 2042.
Section 2042 requires inclusion in the gross estate of the proceeds of a policy insuring the decedent's life and payable to a beneficiary other than the decedent's executor where "the decedent possessed at his death any of the incidents of ownership, exercisable either alone or in conjunction with any other person." Sec. 2042(2). The regulations provide that, in determining whether the decedent possessed any incidents of ownership, regard must be given to the effect of state law upon the terms of the policy. Sec. 20.2042-1(c)(5), Estate Tax Regs. By way of illustration, the regulations pose the example of a decedent who owns a community interest in a policy by virtue of state law. In California, the determination as to whether an asset is separate or community property is generally made as of the time of acquisition. See v. See,64 Cal. 2d 778, 415 P.2d 776, 51 Cal. Rptr. 888 (1966); In re Marriage of Bouquet,16 Cal. 3d 583, 546 P.2d 1371, 128 Cal. Rptr. 427 (1976). If an asset is community property when acquired, it remains so throughout *570 the marriage unless the spouses agree to change its nature or one spouse makes a gift of his interest to the other. See v. See,supra.
By statute, personal property acquired by one spouse during marriage is presumed to be community property. Cal. Civ. Code § 5110 (West 1983). The presumption is, however, rebuttable and may be overcome by a preponderance of the evidence. In re Marriage of Stoner,147 Cal. App. 3d 858, 195 Cal. Rptr. 351 (1983). Respondent reasons that the payment by the Center of the premiums on the Travelers policy constituted compensation to the decedent, Yuengling v. Commissioner,69 F.2d 971 (3d Cir. 1934), and that, because the earnings of either spouse during marriage are community property, the policy necessarily was a community asset under the well-settled rule in California that a life insurance policy acquired with community funds is a community asset. Life Insurance Co. of North America v. Cassidy,35 Cal. 3d 599, 200 Cal. Rptr. 28, 676 P.2d 1050 (1984); Tyre v. Aetna Life Insurance Co.,54 Cal. 2d 399, 353 P.2d 725 (1960); Grimm v. Grimm,26 Cal. 2d 173, 157 P.2d 841 (1945); Blethen v. Pacific Mutual Life Insurance Co.,198 Cal. 91, 243 P. 431 (1926). *571 Thus, respondent concludes that the decedent had a community interest in the Travelers policy, and therefore one-half of the proceeds is includible in the decedent's gross estate. We agree with respondent's reasoning as far as it goes. In our view, however, the pivotal question, as petitioner correctly points out, is whether the parties had agreed that the Travelers policy was to be owned by Robert as his separate property. Such an agreement would override the statutory presumption in favor of community property and would control regardless as to whether the premium was paid from community property. In California, an agreement providing that property is to be held as separate property need not be written; it may be oral, provided that the parties "execute" the agreement by their subsequent conduct. Estate of Neilson,57 Cal. 2d 733, 22 Cal. Rptr. 1, 371 P.2d 745 (1962); Kenney v. Kenney,220 Cal. 134, 30 P.2d 398 (1934). Based on the record before us, we find that Robert and the decedent orally agreed that the Travelers policy was to be Robert's separate property. Both Robert and Robert's father testified convincingly that Robert and the decedent had discussed with Robert's father *572 the estate tax consequences resulting from cross-ownership of life insurance policies. Robert testified that, based on these discussions, he and the decedent agreed that each would own as separate property insurance on the other's life. The decedent signed the application as the proposed insured and thereby agreed to its terms, including the designation of Robert as sole owner. The policy was eventually issued to Robert as sole owner. We view these facts as confirming the existence of Robert's and decedent's oral agreement that the policy was to be Robert's separate property. We are satisfied therefore that petitioner has met the burden in California for overcoming the statutory presumption in favor of community property. While we acknowledge that the result reached herein differs from the result in Estate of Meyer v. Commissioner,66 T.C. 41 (1976), affd. without opinion 566 F.2d 1182 (9th Cir. 1977), we believe that our conclusion is nevertheless consistent with our decision in that case. In Estate of Meyer, we held, on somewhat similar facts, that the insurance proceeds at issue were includible in the gross estate under section 2042 because the petitioner failed to satisfy *573 the burden of proving that the policy was the surviving spouse's separate property under Washington law. In Washington, the presumption in favor of community property can only be overcome by clear and convincing evidence. In California, the presumption may be defeated by a preponderance of the evidence. Although petitioner is not required under section 2042 to include the proceeds of the Travelers policy in the decedent's estate, petitioner is not, so to speak, "home free". Respondent argues alternatively that, even if the decedent did not have a Community interest in the policy at death, one-half of the proceeds are still subject to tax under section 2035. Section 2035, as in effect at the time of decedent's death, provides that the gross estate includes "the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, during the three-year period ending on the date of the decedent's death." Sec. 2035(a). [8] Although the statute excepts from the general rule of automatic inclusion gifts that do not exceed the gift tax annual exclusion, the exception expressly does not apply to "any transfer with respect *574 to a life insurance policy." Sec. 2035(b)(2). [9]
Where life insurance on the decedent's life is owned by another, the courts have generally held that the payment of the premiums by the decedent, whether directly or indirectly, amounts to a transfer of the entire policy under section 2035 where the policy was procured at the instance of the decedent within the three-year statutory period. First National Bank of Oregon v. United States,488 F.2d 575 (9th Cir. 1973); *575 Detroit Bank & Trust Co. v. United States,467 F.2d 964 (6th Cir. 1972), cert. denied 410 U.S. 929 (1973); Bel v. United States,452 F.2d 683 (5th Cir. 1971), cert. den. 406 U.S., 919 (1972); Estate of Kurihara v. Commissioner,82 T.C. 51 (1984). The result in these cases is that the amount of the proceeds is includible in the insured-decedent's estate. On the other hand, where the policy owned by a third party was procured at the decedent's instance outside the three-year statutory period, then only the premiums paid by the decedent within the three-year period are includible under section 2035. First National Bank of Midland, Texas v. United States,423 F.2d 1286 (5th Cir. 1970); Estate of Coleman v. Commissioner,52 T.C. 921 (1969). That the Travelers policy was issued and the premium paid within the three-year statutory period is not in dispute. Petitioner does not claim that only the amount of the decedent's share of the premium paid with respect to the policy is includible in the gross estate under First National Bank of Midland and Coleman. Rather, petitioner maintains that since the Center, and not the decedent, paid the premium on the policy, there was no "transfer" for *576 purposes of section 2035. In Chase National Bank of City of New York v. United States,278 U.S. 327, 49 S. Ct. 126, 128, 73 L.Ed. 405 (1929), the Supreme Court pointed out that the word "transfer", as used in the predecessor to section 2035, must be given a liberal construction: Obviously, the word "transfer" in the statute, or the privilege which may constitutionally be taxed, cannot be taken in such a restricted sense as to refer only to the passing of particular items of property directly from the decedent to the transferee. It must, we think, at least include the transfer of property procured through expenditures by the decedent with the purpose, effected at his death, of having it pass to another. Thus, our inquiry as to whether the decedent made a "transfer" does not stop with the fact that the policy premium was paid by a check drawn on the Center's bank account. The payment of the policy premium would constitute a "constructive transfer" of the policy if the premium payment by the Center was compensation to either the decedent or Robert. If the payment of the premium was compensation to either one, then under the rule in California that one spouse has a community interest *577 in the earnings of the other, Cal. Civ. Code secs. 5108, 5110 (West 1983) e.g.,Thorpe v. Thorpe,75 Cal. App. 2d 605, 171 P.2d 126 (1st. Dist. Ct. App; 1946), the decedent must be deemed to have paid one-half of the premium, and therefore to have "transferred" one-half of the right to the proceeds to Robert within the three-year period. We find that the evidence before us supports the conclusion that the premium payment was compensation. Although the decedent and Robert did not receive salaries for the services rendered to the Center, they did receive compensation for the conduct of workshops. On the 1977 tax return filed by Robert for the Center, the decedent and Robert were reported as providing services to the Center on a full-time basis (although it is not clear in which capacity, i.e., as officers, directors, educational consultants or combination thereof). The Center was designated as the decedent's employer on the insurance application, the State of California Marital Property Declaration and the Federal estate tax return. Despite the fact that the April 8, 1978 resolution authorizing the procurement of insurance on the decedent's and Robert's lives stated that the insurance *578 was to enhance the Center's ability to obtain loans and to ensure that the reading program then being developed was completed in the event of the death of either the decedent or Robert, the Travelers policy did not designate the Center as either owner or beneficiary. Robert, the owner and beneficiary of the Travelers policy, was clearly never under any legal obligation to apply the policy proceeds in furtherance of the Center's purposes. Further, we do not give much weight to the wording of the April 8, 1976 resolution in view of the facts that the application for the Travelers policy was made five months prior to the adoption of the resolution and that the policy was issued one month prior thereto. As we view the evidence, the logical characterization of the Center's payment of the premium on the decedent's life was that it was compensation to the decedent. Accord,Yuengling v. Commissioner,69 F.2d 971 (3d Cir. 1934); Frost v. Commissioner,52 T.C. 89 (1969). It follows then that one-half of the premium, the amount of the decedent's interest in the compensation, was "constructively" paid by the decedent, and that therefore half of the proceeds are includible in the decedent's estate *579 under section 2035. Petitioner maintains, however, that there was no constructive payment of one-half of the premium by the decedent because the decedent did not "control" the Center and therefore the Center was not the decedent's agent for the purposes of obtaining insurance on the decedent's life. This absence of "control", according to petitioner, thus distinguishes the present case from that presented in Estate of Kurihara,82 T.C. 51 (1984) and in Detroit Bank & Trust Co. v. United States,467 F.2d 964 (6th Cir. 1972).In our view, the factor of control may be relevant in determining whether the trustee of a trust created by the decedent acted as the decedent's agent in paying the premiums on a policy on the decedent's life that is part of the trust corpus; it is not, however, relevant where the payment of the premium by the decedent's employer is, as here, a form of compensation to the decedent. [10]
Having found *580 that one-half of the proceeds of the Travelers policy is includible in the decedent's estate, we must next consider whether the decedent's estate is entitled to a marital deduction under section 2056 for the amount passing to Robert. Section 2056 authorizes a marital deduction for amounts passing to the surviving spouse from the decedent's estate. Sec. 2056(a). Section 2056 (c)(1)(A), as in effect on the date of the decedent's death, limits the amount of the deduction to the greater of $250,000 or one-half of the adjusted gross estate. Sections 2056(c)(1)(C) and 2056(c)(2)[11] *581 provide a further limitation applicable to an estate that includes community property. The adjustment required under these provisions requires a reduction in the amount of the maximum marital deduction to reflect the net amounts of community property passing to the surviving spouse. Prior to the Tax Reform Act 1976, the maximum marital deduction was one-half of the adjusted gross estate. This marital deduction provision, which was enacted as part of the Revenue Act of 1948, Pub. L. 471, 62 Stat. 110, 80th Cong., 2d Sess., was designed to accord equal estate tax treatment in community and non-community property states. S. Rept. No. 1013, 80th Cong., 2d Sess. (1948), reprinted in 1948-1 C.B. 285, 304-305. To effectuate parity of treatment, the maximum deduction was reduced to reflect the inclusion of any community property in the gross estate. Thus, prior to the Tax Reform Act of 1976, the maximum allowable marital deduction for an estate that consisted entirely of community property would have been zero. S. Rept. No. 1013, supra,1948-1 C.B. at 345. In 1976, the quantitative limitation on the maximum allowable marital deduction was increased to the greater of $250,000 or one-half of the *582 adjusted gross estate. Pub. L. 94-455, 90 Stat. 1854. The legislative purpose behind increasing the limit was the belief in Congress "that a decedent with a small or medium sized estate should be able to leave a minimum amount of property to the surviving spouse without the imposition of an estate tax." H. Rept. No. 94-1380 (1976), 1976-3 C.B. 735, 751. To maintain parity in the application of the new liberalized provision in both community and non-community property states, the 1976 provisions require that the $250,000 limitation (as well as the limitation of one-half of the adjusted gross estate) must be adjusted to reflect the community property content in any given estate. As a result of the 1976 changes, an estate that consisted entirely of community property, but which amounted to less than $250,000, might be entitled to a limited deduction under section 2056. In the instant case, the applicable limit, before any adjustment on account of the community assets included in the estate, is $250,000. Section 2056(c)(1)(C) provides that the $250,000 limitation must be reduced by the net amount of community property includible in the gross estate. Hre, the entire estate consisted *583 of community property, and the value of that property, net of the deductions allowed under section 2053 for claims and expenses of administration, amounted to $275,647.76 [12]. Since the net amount of community property includible in the estate exceeds the $250,000 limitation, there is no amount allowable to the decedent's estate as a marital deduction under section 2056. Decision will be entered for the respondent.
Footnotes
1. All statutory references are to the Internal Revenue Code as in effect at the date of the decedent's death.↩
2. Neither the appropriate Form 712 attached to the Federal estate tax return nor anything else in the record disclose the type of insurance represented by the All American Life & Casualty Company policy.↩
3. The estate included all of the proceeds of the All American Life & Casualty Company policy in the gross estate. Respondent, however, has determined that only one-half of the proceeds of the policy was properly includible in the gross estate.↩
4. The books were entitled Mathematics Their Way,Mathematics: A Way of Thinking, and Workjobs II.↩
5. Mr. Lorton testified that he had monthly luncheon meetings with all his adult children and their spouses. Mr. Lorton testified that two of his four sons, Jack, a stockbroker, and William, formerly with Connecticut General Mutual Insurance Company, had some professional interest or experience in estate planning. Estate planning was generally a frequent topic of discussion, including estate planning considerations with respect to the ownership of life insurance.↩
6. The estate reported on the Schedule D of the Federal estate tax return that the premiums for all of the policies insuring the decedent's life, except the All American Life & Casualty Company policy, were paid by the Center.↩
7. SEC. 2033. PROPERTY IN WHICH THE DECEDENT HAD AN INTEREST. The value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death.
8. Prior to amendment by the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1848, section 2035↩ provided that transfers in contemplation of death were includible in the gross estate. Transfers made within three years of death were presumed to have been made in contemplation of death. The 1976 revision replaced the presumption (and eliminated the contemplation of death inquiry) with a rule of automatic inclusion for all transfers made within three years of death. 9. Section 2035(b)(1)↩ also excepts from the general rule of inclusion "any bona fide sale for an adequate and full consideration in money or money's worth." Petitioner has not claimed that the exception is applicable, and therefore we express no opinion on the applicability of the exception to the case before us.
10. It should be noted that petitioner has not claimed that the decedent and Robert had orally agreed to divide equally all compensation received. Cf. Estate of Wilmot,T.C. Memo. 1970-240; Mills v. Commissioner,12 T.C. 468 (1949), affd. 183 F.2d 32↩ (9th Cir. 1950).
11. Section 2056(c)(2) provides that the quantitative limitation on the maximum marital deduction must be reduced by the following: (i) the value of the property which is at the time of the death of the decedent held as such community property; and (ii) the value of property transferred by the decedent during his life, if at the time of such transfer the property was held as such community property; and (iii) the amount receivable as insurance under policies on the life of the decedent, to the extent purchased with premiums or other consideration paid out of property held as such community property * * *↩
12. The gross estate, which is entirely composed of community property totalled $307,390.76. This amount includes one-half of the proceeds of the Travelers policy, which, as a result of our holding herein, is subject to Federal estate tax. The aggregate of the deductions allowable under section 2053, all of which are allocable to the community property under section 2056(c)(1)(C)(ii)↩, totals $31,743.00. Thus, the net amount of community property includible in the estate was $275,647.76.